# ESCONDIDO MUTUAL WATER CO. ET AL. *v.* LA JOLLA BAND OF MISSION INDIANS ET AL.

No. 82–2056.   Argued March 26, 1984—Decided May 15, 1984

White, J., delivered the opinion for a unanimous Court.

*Paul D. Engstrand* argued the cause for petitioners. With him on the brief were *Donald R. Lincoln, Leroy A. Wright, John R. Schell, Kent H. Foster,* and *C. Emerson Duncan II.*

*Jerome M. Feit* argued the cause for respondent Federal Energy Regulatory Commission urging reversal. With him on the briefs were *Stephen R. Melton, Arlene Pianko Groner,* and *Kristina Nygaard.*

*Elliott Schulder* argued the cause for respondent Secretary of the Interior. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Dirk D. Snel,*

and *James C. Kilbourne. Robert S. Pelcyger* argued the cause for respondents La Jolla Band of Mission Indians et al. With him on the brief were *Scott B. McElroy, Jeanne S. Whiteing,* and *Arthur J. Gajarsa.\**

JUSTICE WHITE delivered the opinion of the Court.

Section 4(e) of the Federal Power Act (FPA), 41 Stat. 1066, as amended, 16 U. S. C. § 797(e), authorizes the Federal Energy Regulatory Commission (Commission)[1] to issue licenses for the construction, operation and maintenance of hydroelectric project works located on the public lands and reservations of the United States, including lands held in trust for Indians. The conditions upon which such licenses may issue are contained in § 4(e) and other provisions of the FPA. The present case involves a dispute among the Commission, the Secretary of the Interior (Secretary), and several Bands of the Mission Indians over the role each is to play in determining what conditions an applicant must meet in order to obtain a license to utilize hydroelectric facilities located on or near six Mission Indian Reservations.

I

The San Luis Rey River originates near the Palomar Mountains in northern San Diego County, Cal. In its natural condition, it flows through the reservations of the La

---

*Briefs of *amici curiae* urging reversal were filed for the American Public Power Association et al. by *Robert L. McCarty, George H. Williams, Jr., Donald H. Hamburg, Christopher D. Williams, Frances E. Francis,* and *Robert C. McDiarmid;* for the Edison Electric Institute by *William J. Madden, Jr., Frederick T. Searls, Peter B. Kelsey,* and *William L. Fang;* and for the Joint Board of Control of the Flathead, Mission and Jocko Valley Irrigation Districts of the Flathead Irrigation Project, Montana, by *Frank J. Martin, Jr.,* and *John D. Sharer.*

*Patrick A. Parenteau* filed a brief for the National Wildlife Federation et al. as *amici curiae.*

[1] The term "Commission" refers to the Federal Power Commission prior to October 1, 1977, and to the Federal Energy Regulatory Commission thereafter. See 42 U. S. C. §§ 7172(a), 7295(b).

Jolla, Rincon, and Pala Bands of Mission Indians. The reservations of the Pauma, Yuima,[2] and three-quarters of the reservation of the San Pasqual Bands of Mission Indians are within the river's watershed. These six Indian reservations were permanently established pursuant to the Mission Indian Relief Act of 1891 (MIRA), ch. 65, 26 Stat. 712.

Since 1895, petitioner Escondido Mutual Water Co. (Mutual) and its predecessor in interest have diverted water out of the San Luis Rey River for municipal uses in and around the cities of Vista and Escondido. The point of diversion is located within the La Jolla Reservation, upstream from the other reservations. Mutual conveys the water from the diversion point to Lake Wohlford, an artificial storage facility, by means of the Escondido canal, which crosses parts of the La Jolla, Rincon, and San Pasqual Reservations.[3]

In 1915, Mutual constructed the Bear Valley powerhouse downstream from Lake Wohlford. Neither Lake Wohlford nor the Bear Valley plant is located on a reservation. In 1916, Mutual completed construction of the Rincon powerhouse, which is located on the Rincon Reservation. Both of these powerhouses generate electricity by utilizing waters diverted from the river through the canal.

Following the enactment of the Federal Water Power Act of 1920, ch. 285, 41 Stat. 1063 (codified as Part I of the FPA,

---

[2] The Yuima tracts of land are under the jurisdiction of the Pauma Band. Thus, while there are six Mission Indian Reservations involved in the present dispute, only five Indian Bands are represented.

[3] Various agreements, dating back to 1894, among the Secretary, the Bands whose land the canal traverses, and Mutual and its predecessor purportedly grant Mutual rights-of-way for the canal in exchange for supplying certain amounts of water to the Bands. The validity of these agreements is the subject of separate, pending litigation instituted by the Bands in 1969. *Rincon Band of Mission Indians* v. *Escondido Mutual Water Co.*, Nos. 69–217S, 72–276–S, and 72–271–S (SD Cal.).

In addition, the Bands have sued the United States pursuant to the Indian Claims Commission Act, ch. 959, 60 Stat. 1049, 25 U. S. C. § 70 *et seq.* (1976 ed.), for failure to protect their water rights. *Long* v. *United States*, No. 80–A1 (Cl. Ct.). That proceeding is also pending.

16 U. S. C. § 791a *et seq.*), Mutual applied to the Commission for a license covering its two hydroelectric facilities. In 1924, the Commission issued a 50-year license covering the Escondido diversion dam and canal, Lake Wohlford, and the Rincon and Bear Valley powerhouses.

The present dispute began when the 1924 license was about to expire. In 1971, Mutual and the city of Escondido filed an application with the Commission for a new license. In 1972, the Secretary requested that the Commission recommend federal takeover of the project after the original license expired.[4] Later that year, the La Jolla, Rincon, and San Pasqual Bands, acting pursuant to § 15(b) of the FPA,[5] applied for a nonpower license under the supervision of Interior, to take effect when the original license expired. The Pauma and Pala Bands eventually joined in this application.

After lengthy hearings on the competing applications,[6] an Administrative Law Judge concluded that the project was not subject to the Commission's licensing jurisdiction because

---

[4] Section 14(b), 16 U. S. C. § 807(b), of the FPA authorizes the Commission to recommend to Congress that the Federal Government take over a project following expiration of the license. If Congress enacts legislation to that effect, the project is operated by the Government upon payment to the original licensee of its net investment in the project and certain severance damages.

[5] Section 15(b), 16 U. S. C. § 808(b), authorizes the Commission to grant a license for use of a project as a "nonpower" facility if it finds the project no longer is adapted to power production. In that event, the new licensee must make the same payments to the original licensee that are required of the United States pursuant to § 14(b). See n. 4, *supra*.

[6] Earlier, the Secretary and the La Jolla, Rincon, and San Pasqual Bands filed complaints with the Commission, alleging that Mutual violated the provisions of the 1924 license by permitting the Vista Irrigation District to use the project facilities and by using the canal to divert water pumped from a lake created by Vista nine miles above Mutual's diversion dam. They sought, among other things, an increase in the annual charges paid to the Bands under the license. These complaints were considered in conjunction with the competing applications, and the Commission awarded readjusted annual charges to the three Bands. The Commission's resolution of that issue is not before us.

the power aspects of the project were insignificant in comparison to the project's primary purpose—conveying water for domestic and irrigation consumption. 6 FERC ¶ 63,008 (1977).[7] The Commission, however, reversed that decision and granted a new 30-year license to Mutual, Escondido, and the Vista Irrigation District, which had been using the canal for some time to convey water pumped from Lake Henshaw, a lake located some nine miles above Mutual's diversion dam. 6 FERC ¶ 61,189 (1979).

In its licensing decision, the Commission made three rulings that are the focal point of this case. First, the Commission ruled that § 4(e) of the FPA did not require it to accept without modification conditions which the Secretary deemed necessary for the adequate protection and utilization of the reservations.[8] Accordingly, despite the Secretary's insistence, the Commission refused to prohibit the licensees from interfering with the Bands' use of a specified quantity of water, *id.*, at 61,415, and n. 146, or to require that water pumped from a particular groundwater basin[9] not be transported through the licensed facilities without the written consent of the five Bands, *id.*, at 61,145, and n. 147. Other conditions proposed by the Secretary were similarly rejected or modified. See *id.*, at 61,414–61,417. Second,

---

[7] The Bear Valley powerhouse has a generating capacity of only 520 kilowatts. The Rincon powerhouse is capable of producing only 240 kilowatts. The Administrative Law Judge noted that "[t]he horsepower generated by the entire project is not even the equivalent to that produced by a half dozen modern automobiles." 6 FERC, at 65,093.

[8] The Commission concluded that § 4(e) required it "to give great weight to the judgments and proposals of the Secretaries of the Interior and Agriculture" but that under § 10(a) it retained ultimate authority for determining "the extent to which such conditions will in fact be included in particular licenses." 6 FERC, at 61,414.

[9] Groundwater is water beneath the surface of the earth. The condition suggested by the Secretary applied to water which Vista pumped from the Warner groundwater basin underlying Lake Henshaw and its headwaters in order to augment the natural flows into the lake.

although it imposed some conditions on the licensees in order to "preclude any possible interference or inconsistency of the power license . . . with the purpose for which the La Jolla, Rincon, and San Pasqual reservations were created,"[10] *id.*, at 61,424–61,425, the Commission refused to impose similar conditions for the benefit of the Pala, Pauma, and Yuima Reservations, ruling that its § 4(e) obligation in that respect applies only to reservations that are physically occupied by project facilities. Finally, the Commission rejected the arguments of the Bands and the Secretary that a variety of statutes, including § 8 of the MIRA, required the licensees to obtain the "consent" of the Bands before the license could issue.

On appeal, the Court of Appeals for the Ninth Circuit reversed each of these three rulings. *Escondido Mutual Water Co.* v. *FERC*, 692 F. 2d 1223, amended, 701 F. 2d 826 (1983). The court held that § 4(e) requires the Commission to accept without modification any license conditions recommended by the Secretary, subject to subsequent judicial review of the propriety of the conditions, that the Commission is required to satisfy its § 4(e) obligations with respect to all six of the reservations affected by the project and not just the three through which the canal passes, and that § 8 of the MIRA requires the licensees to obtain right-of-way permits from the La Jolla, Rincon, and San Pasqual Bands before using the licensed facilities located on the reservations.[11]

---

[10] For example, the Commission required the licensees to permit the three Bands to use certain quantities of water under certain circumstances. See *id.*, at 61,424–61,432.

[11] Judge Anderson dissented from the order entered on petition for rehearing, 701 F. 2d, at 827–831, concluding that neither § 8 of the MIRA nor § 16 of the Indian Reorganization Act, 25 U. S. C. § 476, requires that tribal consent be obtained before the Bands' lands can be used for a hydroelectric project licensed under the FPA. He also concluded that the Secretary's § 4(e) conditions have to be included in the license only to the extent they are reasonable and that the reasonableness determination is to be made initially by the Commission.

Mutual, Escondido, and Vista filed the present petition for certiorari, which we granted, 464 U. S. 913 (1983), challenging all three of the Court of Appeals' rulings.[12]   We address each in turn.

## II

Section 4(e) provides that licenses issued under that section "shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations."   16 U. S. C. § 797(e).   The mandatory nature of the language chosen by Congress appears to require that the Commission include the Secretary's conditions in the license even if it disagrees with them.   Nonetheless, petitioners[13] argue that an examination of the statutory scheme and legislative history of the Act shows that Congress could not have meant what it said.   We disagree.

We first note the difficult nature of the task facing petitioners.   Since it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses, we have often stated that " '[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.' "   *North Dakota* v. *United States*, 460 U. S. 300, 312 (1983) (quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980)).   Congress' apparent desire that the Secretary's conditions "shall" be included in the license must therefore be given effect unless there are clear expressions of legislative intent to the contrary.

---

[12] The Court of Appeals affirmed the Commission's conclusion that it had jurisdiction over the project, and the parties have not sought review of that ruling.

[13] The Commission did not petition for review of the Court of Appeals' decision but filed a brief and appeared at oral argument urging reversal. Since the Commission's arguments largely parallel those presented by Mutual, Escondido, and Vista, our use of the term petitioners includes the Commission.

Petitioners initially focus on the purpose of the legislation that became the relevant portion of the FPA. In 1920, Congress passed the Federal Water Power Act in order to eliminate the inefficiency and confusion caused by the "piecemeal, restrictive, negative approach" to licensing prevailing under prior law. *First Iowa Hydro-Electric Cooperative* v. *FPC*, 328 U. S. 152, 180 (1946). See H. R. Rep. No. 61, 66th Cong., 1st Sess., 4–5 (1919). Prior to passage of the Act, the Secretaries of the Interior, War, and Agriculture each had authority to issue licenses for hydroelectric projects on lands under his respective jurisdiction. The Act centralized that authority by creating a Commission, consisting of the three Secretaries,[14] vested with exclusive authority to issue licenses. Petitioners contend that Congress could not have intended to empower the Secretary to require that conditions be included in the license over the objection of the Commission because that would frustrate the purpose of centralizing licensing procedures.

Congress was no doubt interested in centralizing federal licensing authority into one agency, but it is clear that it did not intend to relieve the Secretaries of all responsibility for ensuring that reservations under their respective supervision were adequately protected. In a memorandum explaining the administration bill, the relevant portion of which was enacted without substantive change,[15] O. C. Merrill, one of the chief draftsmen of the Act and later the first Commission Secretary, explained that creation of the Commission "will

---

[14] In 1930, the Commission was reorganized as a five-person body, independent from the Secretaries. Act of June 23, 1930, ch. 572, 46 Stat. 797.

[15] Between 1914 and 1917, four bills dealing with the licensing of hydroelectric projects were introduced into Congress, none successfully. In 1918, a bill prepared by the Secretaries of War, the Interior, and Agriculture, at the direction of President Wilson, was introduced. H. R. 8716, 65th Cong., 2d Sess. (1918). It contained the language of the § 4(e) proviso basically as it is now framed. Because of the press of World War I and other concerns, the legislation was not enacted until 1920. See J. Kerwin, Federal Water-Power Legislation 217–263 (1926).

not interfere with the special responsibilities which the
several Departments have over the National Forests, public
lands and navigable rivers." Memorandum on Water Power
Legislation from O. C. Merrill, Chief Engineer, Forest Serv-
ice, dated October 31, 1917, App. 371. With regard to what
became § 4(e), he wrote:

> "4. Licenses for power sites within the National For-
> ests to be subject to such provisions for the protection of
> the Forests as the Secretary of Agriculture may deem
> necessary. Similarly, for parks and other reservations
> under the control of the Departments of the Interior and
> of War. Plans of structures involving navigable streams
> to be subject to the approval of the Secretary of War.
> "This provision is for the purpose of preserving the
> administrative responsibility of each of the three De-
> partments over lands and other matters within their
> exclusive jurisdiction." *Id.*, at 373–374.

Similarly, during hearings on the bill, Secretary of Agricul-
ture Houston explained that the Grand Canyon did not need
to be exempted from the licensing provisions, stating:

> "I can see no special reason why the matter might not
> be handled safely under the provisions of the proposed
> measure, which requires that developments on Govern-
> ment reservations may not proceed except with the
> approval of the three heads of departments—the com-
> mission—*with such safeguards as the head of the de-
> partment immediately charged with the reservation may
> deem wise.*" Water Power: Hearings before the House
> Committee on Water Power, 65th Cong., 2d Sess., 677
> (1918) (emphasis added).

The Members of Congress understood that under the Act
the Secretary of the Interior had authority with respect to
licenses issued on Indian reservations over and above that

possessed by the other Commission members. Senator Walsh of Montana, a supporter of the Act, explained:

> "[W]hen an application is made for a license to construct a dam within an Indian reservation, the matter goes before the commission, which consists of the Secretary of War, the Secretary of the Interior, and the Secretary of Agriculture. They all agree that it is in the public interest that the license should be granted, or a majority of them so agree. *Furthermore, the head of the department must agree; that is to say, the Secretary of the Interior in the case of an Indian reservation must agree that the license shall be issued.*" 59 Cong. Rec. 1564 (1920) (emphasis added).

It is thus clear enough that while Congress intended that the Commission would have exclusive authority to issue all licenses, it wanted the individual Secretaries to continue to play the major role in determining what conditions would be included in the license in order to protect the resources under their respective jurisdictions. The legislative history concerning § 4(e) plainly supports the conclusion that Congress meant what it said when it stated that the license "shall . . . contain such conditions as the Secretary . . . shall deem necessary for the adequate protection and utilization of such reservations."[16]

---

[16] Petitioners note that in 1930, when the structure of the Commission was changed, see n. 14, *supra*, James Lawson, then Acting Chief Counsel of the Commission, stated that under the structure then in existence, "[t]he Commission now has power to override the head of a department as to the consistency of a license with the purpose of any reservation." Investigation of Federal Regulation of Power: Hearings pursuant to S. Res. 80 and S. 3619 before the Senate Committee on Interstate Commerce, 71st Cong., 2d Sess., 358 (1930). This snippet of postenactment history does not help petitioners' cause at all. All parties agree that the Commission has the authority to make a finding that "the license will not interfere *or be inconsistent* with the purpose for which such reservation was created or acquired." 16 U. S. C. § 797(e) (emphasis added). This is separate from

Petitioners next argue that a literal reading of the conditioning proviso of § 4(e) cannot be squared with other portions of the statutory scheme. In particular, they note that the same proviso that grants the Secretary the authority to qualify the license with the conditions he deems necessary also provides that the Commission must determine that "the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." 16 U. S. C. § 797(e). Requiring the Commission to include the Secretary's conditions in the license over its objection, petitioners maintain, is inconsistent with granting the Commission the power to determine that no interference or inconsistency will result from issuance of the license because it will allow the Secretary to "veto" the decision reached by the Commission. Congress could not have intended to "'paralyze with one hand what it sought to promote with the other,'" *American Paper Institute, Inc.* v. *American*

the Secretary's authority to condition the license for the adequate protection and utilization of the reservation. Lawson's statement was clearly concerned with the former. Indeed, a contemporaneous memorandum by the Commission's legal staff (of which Lawson was the head), stated that the Secretary of the Interior had authority under what is now § 4(e) "'to prescribe conditions to be inserted in the license for the protection and utilization of the reservation.'" Brief for Secretary of the Interior 33, quoting Memorandum of Sept. 20, 1929, p. 23. It may well be that in a particular case the conditions suggested by the Secretary will unduly undermine the Commission's licensing judgment. However, as noted *infra*, at 777, and n. 19, that is a determination the court of appeals is to make.

Similarly misplaced is petitioners' reliance on the fact that once the bill was passed, President Wilson, at the request of the Secretary, withheld his signature until Congress agreed that it would pass legislation in its next session removing national parks and monuments from the scope of the Act. Contrary to petitioners' assertion, this does not show that the Secretary knew that § 4(e) did not grant him enough authority to protect these lands, which were within his "conditioning" jurisdiction. Rather, the Secretary objected to the inclusion of national parks and monuments in the legislation because he believed that Congress, not the Commission, should decide on a case-by-case basis whether any hydroelectric development should occur in these areas. H. R. Rep. No. 1299, 66th Cong., 3d Sess., 2 (1921).

*Electric Power Service Corp.*, 461 U. S. 402, 421 (1983) (quoting *Clark* v. *Uebersee Finanz-Korporation, A.G.*, 332 U. S. 480, 489 (1947)), petitioners contend.

This argument is unpersuasive because it assumes the very question to be decided. All parties agree that there are limits on the types of conditions that the Secretary can require to be included in the license:[17] the Secretary has no power to veto the Commission's decision to issue a license and hence the conditions he insists upon must be reasonably related to the protection of the reservation and its people.[18] The real question is whether the Commission is empowered to decide when the Secretary's conditions exceed the permissible limits. Petitioners' argument assumes that the Commission has the authority to make that decision. However, the statutory language and legislative history conclusively indicate that it does not; the Commission "shall" include in the license the conditions the Secretary deems necessary. It is then up to the courts of appeals to determine whether the conditions are valid.[19]

Petitioners contend that such a scheme of review is inconsistent with traditional principles of judicial review of administrative action. If the Commission is required to include the conditions in the license even though it does not agree with them, petitioners argue, the courts of appeals will not be

---

[17] Even the Secretary concedes that the conditions must be "reasonable and supported by evidence in the record." Brief for Secretary of the Interior 37. See also Tr. of Oral Arg. 20.

[18] By its terms, § 4(e) requires that the conditions must be "necessary for the adequate protection and utilization of such reservations." At oral argument, the Secretary agreed that the conditions should ultimately be sustained only if they "are reasonably related to the purpose of ensuring that the purposes of the reservation are adequately protected, and that the reservation is adequately utilized." *Id.*, at 22.

[19] Section 313(b) of the FPA provides that the Commission's orders, including licenses, can be reviewed "in the United States court of appeals for any circuit wherein the licensee . . . is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." 16 U. S. C. § 825*l*(b).

in a position to grant deference to the Commission's findings and conclusions because those findings and conclusions will not be included in the license. However, that is apparently exactly what Congress intended. If the Secretary concludes that the conditions are necessary to protect the reservation, the Commission is required to adopt them as its own, and the court is obligated to sustain them if they are reasonably related to that goal, otherwise consistent with the FPA, and supported by substantial evidence.[20] The fact that in reality it is the Secretary's, and not the Commission's, judgment to which the court is giving deference is not surprising since the statute directs the Secretary, and not the Commission, to decide what conditions are necessary for the adequate protection of the reservation.[21] There is nothing in the statute

---

[20] Of course, the Commission is not required to argue in support of the conditions if it objects to them. Indeed, it is free to express its disagreement with them, not only in connection with the issuance of the license but also on review. Similarly, the Commission can refuse to issue a license if it concludes that, as conditioned, the license should not issue. In either event, the license applicant can seek review of the conditions in the court of appeals, but the court is to sustain the conditions if they are consistent with law and supported by the evidence presented to the Commission, either by the Secretary or other interested parties. 16 U. S. C. § 825*l*(b).

We note that in the unlikely event that none of the parties to the licensing proceeding seeks review, the conditions will go into effect notwithstanding the Commission's objection to them since the Commission is not authorized to seek review of its own decisions. The possibility that this might occur does not, however, dissuade us from interpreting the statute in accordance with its plain meaning. Congress apparently decided that if no party was interested in the differences between the Commission and the Secretary, the dispute would best be resolved in a nonjudicial forum.

[21] Petitioners also contend that the Secretary's authority to impose conditions on the license is inconsistent with the Commission's authority and responsibility under § 10(a) to determine that "the project adopted . . . will be best adapted to a comprehensive plan . . . for the improvement and utilization of water-power development, and for other beneficial public uses." 16 U. S. C. § 803(a). Our discussion of the alleged conflict between the Commission's authority to make its "no interference or inconsistency" determination and the Secretary's conditioning authority applies with equal force to this contention. The ultimate decision whether to issue

or the review scheme to indicate that Congress wanted the Commission to second-guess the Secretary on this matter.[22]

In short, nothing in the legislative history or statutory scheme is inconsistent with the plain command of the statute that licenses issued within a reservation by the Commission pursuant to § 4(e) "shall be subject to and contain such conditions as the Secretary . . . shall deem necessary for the adequate protection and utilization of such reservations." Since the Commission failed to comply with this statutory command when it issued the license in this case, the Court of Appeals correctly reversed its decision in this respect.[23]

---

the license belongs to the Commission, but the Secretary's proposed conditions must be included if the license issues. Any conflict between the Commission and the Secretary with respect to whether the conditions are consistent with the statute must be resolved initially by the courts of appeals, not the Commission.

Petitioners' assertion that the conditions proposed by the Secretary in this case were outside the Commission's authority to adopt goes to the validity of the conditions, an issue not before this Court. It may well be that the conditions imposed by the Secretary are inconsistent with the provisions of the FPA and that they are therefore invalid (something we do not decide), but that issue is not for the Commission to decide in the first instance but is reserved for the court of appeals at the instance of the licensees and with the participation of the Commission if it is inclined to present its views.

[22] Petitioners also contend that the Commission's longstanding interpretation of § 4(e) is entitled to deference, citing language from its early decisions. *E. g.*, *Pigeon River Lumber Co.*, 1 F. P. C. 206, 209 (1935); *Southern California Edison Co.*, 8 F. P. C. 364, 386 (1949). Petitioners concede, however, that the Commission never actually rejected any of the Secretary's conditions until 1975. *Pacific Gas & Electric Co.*, 53 F. P. C. 523, 526 (1975). Even then, the issue was not squarely presented because there was some question whether § 4(e) even applied in that proceeding. *Ibid.* It is therefore far from clear that the Commission's interpretation is a longstanding one. More importantly, an agency's interpretation, even if well established, cannot be sustained if, as in this case, it conflicts with the clear language and legislative history of the statute.

[23] Mutual, Escondido, and Vista assert that § 4(e) is not at issue in this case because this is a relicensing procedure governed by § 15(a). The Commission was of a different view and dealt with the case as an original

## III

The Court of Appeals also concluded that the Commission's § 4(e) obligations to accept the Secretary's proposed conditions and to make findings as to whether the license is consistent with the reservation's purpose applied to the Pala, Yuima, and Pauma Reservations even though no licensed facilities were located on these reservations. Petitioners contend that this conclusion is erroneous. We agree.

Again, the statutory language is informative and largely dispositive. Section 4(e) authorizes the Commission:

> "To issue licenses . . . for the purpose of constructing . . . dams . . . or other project works . . . upon any part of the public lands and reservations of the United States . . . *Provided,* That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations . . . ."

If a project is licensed "within" any reservation, the Commission must make a "no interference or inconsistency" finding with respect to "such" reservation, and the Secretary may impose conditions for the protection of "such" reservation. Nothing in the section requires the Commission to

---

licensing procedure since the new license included facilities not covered by the 1924 license and since the project being relicensed was "so materially different from the [p]roject . . . which was initially licensed in 1924 that little more than the project number remains the same." 6 FERC ¶ 61,189, p. 61,411 (1979). The licensees did not object to this conclusion in their petition for rehearing to the Commission, and they may not challenge it now. 16 U. S. C. § 825*l*(b). Accordingly, we have no reason to decide whether § 4(e) applies to relicensing proceedings.

make findings about, or the Secretary to impose conditions to protect, any reservation other than the one within which project works are located. The section imposes no obligation on the Commission or power on the Secretary with respect to reservations that may somehow be affected by, but will contain no part of, the licensed project works.

The Court of Appeals, however, purported to discover an ambiguity in the term "within." Positing that the term "reservations" includes not only tribal lands but also tribal water rights, the Court of Appeals reasoned that since a project could not be "within" a water right, the term must have a meaning other than its literal one. This effort to circumvent the plain meaning of the statute by creating an ambiguity where none exists is unpersuasive.

There is no doubt that "reservations" include "interests in lands owned by the United States"[24] and that for many purposes water rights are considered to be interests in lands. See 1 R. Clark, Waters and Water Rights § 53.1 p. 345 (1967). But it does not follow that Congress intended the "reservations" spoken of in § 4(e) to include water rights.[25] The section deals with project works to be located "upon" and "within" a reservation. As the Court of Appeals itself indicated, the section does tend to "paint a geographical picture in the mind of the reader," 692 F. 2d, at 1236, and we find the

---

[24] Section 3(2) of the FPA provides:

" '[R]eservations' means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws . . . ." 16 U. S. C. § 796(2).

[25] Indeed, in another provision of the Act, Congress provided that the term "project" includes "all water-rights . . . lands, or interests in lands the use and occupancy of which are necessary or appropriate in the maintenance" of a "unit of improvement or development." 16 U. S. C. § 796(11). Had Congress thought that water rights were always covered by the term "interests in land," it would not have felt it necessary to refer to water rights.

Court of Appeals' and respondents' construction of the section to be quite untenable. Congress intended the obligation of the Commission and the conditioning power of the Secretary to apply only with respect to the specific reservation upon which any project works were to be located and not to other reservations that might be affected by the project.

The Court of Appeals sought to bolster its conclusion by noting that a literal reading of the term "within" would leave a gap in the protection afforded the Bands by the FPA because "a project may turn a potentially useful reservation into a barren waste without ever crossing it in the geographical sense—e. g., by diverting the waters which would otherwise flow through or percolate under it." *Ibid.* This is an unlikely event, for in this respect the Bands are adequately protected by other provisions of the statutory scheme. First, the Bands cannot be deprived of any water to which they have a legal right. The Commission is expressly forbidden to adjudicate water rights, 16 U. S. C. § 821, and the license applicant must submit satisfactory evidence that he has obtained sufficient water rights to operate the project authorized in the license, 16 U. S. C. § 802(b). Second, if the Bands are using water, the rights to which are owned by the license applicant, the Commission is empowered to require that the license applicant continue to let the Bands use this water as a condition of the license if the Commission determines that the Bands' use of the water constitutes an overriding beneficial public use. 16 U. S. C. § 803(a). See *California* v. *FPC*, 345 F. 2d 917, 923–924 (CA9), cert. denied, 382 U. S. 941 (1965). The Bands' interest in the continued use of the water will accordingly be adequately protected without requiring the Commission to comply with § 4(e) every time one of the reservations might be affected by a proposed project.

Respondents additionally contend that under other provisions of the FPA the § 4(e) proviso at issue applies any time a reservation is "affected" by a licensed project even if none of

the licensed facilities is actually located on the reservation. They rely in particular on § 23(b), which provides that project works can be constructed without a license on nonnavigable waters over which Congress has jurisdiction under its Commerce Clause powers only if, among other things,[26] "no public lands or reservations are affected." 16 U. S. C. § 817. Respondents argue that it would make no sense to conclude that Congress intended to require the Commission to exercise its licensing jurisdiction when a reservation is "affected" by such a project if it did not also intend to afford those reservations all of the protections outlined in § 4(e). However, that is exactly the conclusion that the language of § 4(e) compels, and, contrary to respondents' argument, there is nothing illogical about such a scheme.

Under § 4(e), the Commission is authorized to license projects in two general types of situations—when the project is located on waters (navigable or nonnavigable) over which Congress has jurisdiction under the Commerce Clause and when the project is located upon any public lands or reservations. It is clear that the Commission's obligations to make a "no inconsistency or no interference" determination and to include the Secretary's conditions in the license apply only in the latter situation—when the license is issued "within any reservation." The fact that a person is required to obtain a license in the former situation any time a project on nonnavigable waters affects a reservation indicates only that Congress concluded that in such circumstances the possible disruptive effects of such a project were so great that the Commission should regulate the project through its licensing powers. That is not, as respondents seem to imply, a meaningless gesture if all of the provisions of § 4(e) do not apply.

---

[26] The statute authorizes the construction of project works without a license on nonnavigable waters over which Congress has Commerce Clause jurisdiction if the Commission finds that "the interests of interstate or foreign commerce would [not] be affected by such proposed construction . . . and if no public lands or reservations are affected." 16 U. S. C. § 817.

Even if the Commission is not required to comply with all of the requirements of § 4(e) when it issues such a license, it is still required to shape the license so that the project is best adapted, among other things, for the improvement and utilization of water-power development and for "other beneficial public uses, including recreational purposes." 16 U. S. C. § 803(a). In complying with that duty, the Commission is clearly entitled to consider how the project will affect any federal reservations and to require the licensee to structure the project so as to avoid any undue injury to those reservations. See *Udall* v. *FPC*, 387 U. S. 428, 450 (1967). As noted *supra*, at 782, the Commission can even require that, as a condition of the license, the licensee surrender some of its water rights in order to protect such reservations if the Commission determines that such action would be in the public interest. However, it is clear that Congress concluded that reservations were not entitled to the added protection provided by the proviso of § 4(e) unless some of the licensed works were actually within the reservation.

The scheme crafted by Congress in this respect is sufficiently clear to require us to hold that the Commission must make its "no inconsistency or interference" determination and include the Secretary's conditions in the license only with respect to projects located "within" the geographical boundaries of a federal reservation.

## IV

The final issue presented for review is whether § 8 of the MIRA requires licensees to obtain the consent of the Bands before they operate licensed facilities located on reservation lands. Section 8 provides in relevant part:

"Subsequent to the issuance of any tribal patent,[27] or of any individual trust patent . . ., any citizen of the United States, firm, or corporation may contract with the tribe,

---

[27] Trust patents were issued on September 13, 1892, for the La Jolla and Rincon Reservations, and on July 10, 1910, for the San Pasqual Reservation.

band, or individual for whose use and benefit any lands are held in trust by the United States, for the right to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such lands, which contract shall not be valid unless approved by the Secretary of the Interior under such conditions as he may see fit to impose." 26 Stat. 714.

The Court of Appeals concluded that this provision, which by its terms authorizes private parties to enter into a contract with the Bands, precludes the Commission from licensing those parts of the project that occupy reservation land without the consent of the Indians. When the legislative histories of § 8 and of the FPA are considered, however, the Court of Appeals' interpretation cannot stand.

Section 8 appeared in the MIRA just prior to its passage. Several irrigation companies were seeking rights-of-way across the reservations. The Secretary had concluded that irrigation ditches and flumes would benefit both the settlers and the Indians. H. R. Rep. No. 3282, 50th Cong., 1st Sess., 3–4 (1888). Two Attorneys General, however, had ruled that only Congress could authorize the alienation of Indian lands. *Lemhi Indian Reservation*, 18 Op. Atty. Gen. 563 (1887); *Dam at Lake Winnibigoshish*, 16 Op. Atty. Gen. 552 (1880). In light of these opinions, the Secretary prepared an amendment to the bill, authorizing the Bands to contract for the sale of rights-of-way, subject to Interior's approval. H. R. Rep. No. 3282, *supra*, at 2. Section 8 was therefore designed to authorize the Indians and the Secretary to grant rights-of-way to third parties; it was not intended to act as a limit on the sovereign authority of the Federal Government to acquire or grant rights-of-way over public lands and reservations.

In essence, § 8 increased the Bands' authority over its land so that they had almost the same rights as other private landowners.[28] The Bands were authorized to negotiate with any

---

[28] The Bands' situation was somewhat different since it was necessary to secure the approval of the Secretary for any such contracts.

private party wishing to acquire rights-of-way and to enter into any agreement with those parties, something they were previously unable to do. And, until some overriding authority was invoked, the Bands, like private landowners, had complete discretion whether to grant rights-of-way for hydroelectric project facilities. However, there is no indication that once Congress exercised its sovereign authority to use the land for such purposes the Bands were to have more power to stop such action than would a private landowner in the same situation—both are required to permit such use upon payment of just compensation.[29] Therefore, the only question is whether Congress decided to exercise that authority with respect to Indian lands when it enacted the FPA. The answer to that inquiry was clearly articulated in a somewhat different context more than 20 years ago.

> "The Federal Power Act constitutes a complete and comprehensive plan . . . for the development, transmission and utilization of electric power in any of the streams or other bodies of water over which Congress has jurisdiction under its commerce powers, and upon the public lands and reservations of the United States under its property powers. See § 4(e). It neither overlooks nor excludes Indians or lands owned or occupied by them. Instead, as has been shown, the Act specifically defines and treats with lands occupied by Indians— 'tribal lands embraced within Indian reservations.' See §§ 3(2) and 10(e). The Act gives every indication that, within its comprehensive plan, Congress intended to include lands owned or occupied by any person or persons, including Indians." *FPC* v. *Tuscarora Indian Nation*, 362 U. S. 99, 118 (1960).

---

[29] The FPA requires that when licenses involve tribal lands within a reservation, "the Commission shall . . . fix a reasonable annual charge for the use thereof." 16 U. S. C. § 803(e). When a licensed facility is on private land, the licensee must acquire the appropriate right-of-way from the landowner either by private negotiation or through eminent domain. 16 U. S. C. § 814.

It is equally clear that, when enacting the FPA, Congress did not intend to give Indians some sort of special authority to prevent the Commission from exercising the licensing authority it was receiving from Congress. Indeed, Congress squarely considered and rejected such a proposal. During the course of the debate concerning the legislation, the Senate amended the bill to require tribal consent for some projects. Section 4(e) of the Senate version of the bill provided that "in respect to tribal lands embraced within Indian reservations, which said lands were ceded to Indians by the United States by treaty, no license shall be issued except by and with the consent of the council of the tribe." 59 Cong. Rec. 1534 (1920). However, that amendment was stricken from the bill by the Conference, the conferees stating that they "saw no reason why waterpower use should be singled out from all other uses of Indian reservation land for special action of the council of the tribe." H. R. Conf. Rep. No. 910, 66th Cong., 2d Sess., 8 (1920).

In short, while § 8 of the MIRA gave the Bands extensive authority to determine whether to grant rights-of-way for water projects, that authority did not include the power to override Congress' subsequent decision that all lands, including tribal lands, could, upon compliance with the provisions of the FPA, be utilized to facilitate licensed hydroelectric projects. Under the FPA, the Secretary, with the duty to safeguard reservations, may condition, but may not veto, the issuance of a license for project works on an Indian reservation. We cannot believe that Congress nevertheless intended to leave a veto power with the concerned tribe or tribes. The Commission need not, therefore, seek the Bands' permission before it exercises its licensing authority with respect to their lands.[30]

---

[30] The Bands suggest that even in the absence of § 8 of the MIRA, their consent would be necessary before the license could issue because of their sovereign power to prevent the use of their lands without their consent. Brief for Respondents La Jolla Band of Mission Indians et al. 37–39. However, it is highly questionable whether the Bands have inherent authority

## V

The Court of Appeals correctly determined that the Commission was required to include in the license any conditions which the Secretary of the Interior deems necessary for the protection and utilization of the three reservations in which project works are located.   It was in error, however, in concluding that the Commission was required to fulfill this and its other § 4(e) obligations with respect to the other three reservations affected by the project and that § 8 of the MIRA empowered the Bands to prevent the licensing of facilities on their lands.   The court's judgment is affirmed in part and reversed in part, and the case is remanded to the court for further proceedings consistent with this opinion.

*It is so ordered.*

---

to prevent a federal agency from carrying out its statutory responsibility since such authority would seem to be inconsistent with their status.   See *Oliphant* v. *Suquamish Indian Tribe,* 435 U. S. 191, 208–209 (1978).   In any event, it is clear that all aspects of Indian sovereignty are subject to defeasance by Congress, *United States* v. *Wheeler,* 435 U. S. 313, 323 (1978), and, from the legislative history of the FPA, *supra,* at 787, that Congress intended to permit the Commission to issue licenses without the consent of the tribes involved.