**Joseph M. KEATING, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Department of Agriculture, Intervenor.**

No. 95–1232.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1997.

Decided June 17, 1997.

Gail A. Greely argued the cause and filed the briefs for petitioner.

Patricia L. Weiss, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent. With her on the brief were Jerome M. Feit, Solicitor, and Joseph S. Davies, Deputy Solicitor. Samuel Soopper, Attorney, Mount Rainier, MD, entered an appearance.

Joan M. Pepin, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for intervenor. With her on the brief were Lois J. Schiffer, Assistant Attorney General, and John A. Bryson, Attorney. Anne S. Almy, Attorney, entered an appearance.

Before RANDOLPH, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Federal Energy Regulatory Commission issues licenses allowing private citizens to construct and operate hydroelectric projects within federal reservations. When the Commission refused to grant a license to Joseph M. Keating for a small-scale hydroelectric project in a national forest, he brought this petition for judicial review. The principal issue is whether the Commission properly deferred to the Forest Service in determining that Keating's project would be inconsistent with the purposes for which this national forest was created.

## I

A national forest, like a military reservation or tribal lands embraced within Indian reservations, is a federal "reservation." *See* 16 U.S.C. § 796(2). Congress, or the President alone, withdraws the land from the public domain and sets it aside—reserves it—for those purposes. Keating's hydroelectric project would be within the original boundaries of a federal reservation—the Inyo National Forest in California, established in 1907 through a Presidential Proclamation. The proclamation cited the President's authority to create national forests pursuant the Creative Act of 1891, ch. 561, § 24, 26 Stat. 1103, as amended, 16 U.S.C. § 471 (repealed 1976). *See* 35 Stat. 2134. At the time, the Organic Administration Act of June 4, 1897, ch. 2, § 1, 30 Stat. 35, as codified, 16 U.S.C. § 475, prohibited new national forests, "except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flow, and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States...." *See United States v. New Mexico*, 438 U.S. 696, 705–11, 98 S.Ct. 3012, 3016–19, 57 L.Ed.2d 1052 (1978). All sides to this case assume that the Inyo National Forest was reserved in compliance with the Organic Administration Act.

The general location of the Inyo National Forest may be found by tracing the Los Angeles aqueduct from the San Fernando Valley north to aqueduct's origin some 250 miles away. There, on the eastern slope of the Sierra Nevada, lies the Owens Valley, the site "of extreme conflict between valley residents and the City of Los Angeles and other users" of the valley's water. Final Environmental Impact Statement (FEIS) at xxxi (Oct.1986). The history is told in W.A. CHALFANT, THE STORY OF INYO (1933); and MARC REISNER, CADILLAC DESERT 63 (Penguin books 1993). Construction of the aqueduct began at about the time President Roosevelt issued the proclamation. Some believe the President included the Owens Valley in the Inyo National Forest not to manage whatever timber was there—the area is semi-arid and mostly sagebrush—but to assist Los Angeles in its plan to export the valley's water.

*See* REISNER at 81–84. In the early 1900's the Los Angeles Department of Water and Power began quietly purchasing land and water rights in the valley; in the end, it wound up owning much of the valley floor. *See* FEIS at 3–25. Six years in construction, the Los Angeles aqueduct now accounts for nearly one-third of the city's water supply. Inyo National Forest, *Forest Statistics* (visited May 22, 1997) <http://www.r5.pswfs.gov/inyo/managmnt/stats.htm>. Owens Lake, once a huge, turquoise pool fed by valley streams and filled with brine shrimp and migrating waterfowl, has dried up. *See* REISNER at 59. Stream diversions for the "Los Angeles aqueduct, power generation and irrigation" have completely destroyed "20 percent of the streams in the valley and more than one-half of the flow in another 17 percent of the streams." FEIS at xxxi.

One of the remaining free-flowing valley streams, in the northern portion of the Inyo National Forest, is Pine Creek, where Keating proposed to build and operate his hydroelectric project. Fed by Sierra Nevada snowmelt, Pine Creek "flows through alpine lakes, a hanging valley, ... descends a waterfall," runs for 5 miles through a U-shaped valley, leaves the mountains and empties into the Owens River. *Id.* at 3–36. Keating's site was about a mile downstream from the waterfall. His plan was to shunt water from the stream to a powerhouse, direct it to another development (Rovana) through a penstock (a buried pipe 42" in diameter) and then send the water back into Pine Creek 5.5 miles downstream. Keating and Southern California Edison Company coordinated the design of Pine Creek Project No. 3258, with the objective of adding peaking capacity to the company's system. As hydroelectric projects go, this was to be a small one; total annual output would be only 24,700,000 kilowatt hours. *See* FEIS at 2–5.

In 1985, the Commission directed its staff to assess the cumulative environmental effects of Pine Creek Project No. 3258 and several other hydroelectric projects proposed for the Owens Valley. As to Keating's proposal, the staff's Final Environmental Impact Statement recommended approval only of the component on Pine Creek. The rest of the proposal should be deleted, the staff reported, because it would adversely affect riparian vegetation, aesthetics, and recreation. The staff also suggested modifying the Pine Creek component. In order to protect the stream's substantial wild trout population, there should be screening of the development's intakes and higher minimum flows in the bypassed reach. As so modified, the staff thought the Pine Creek project would still be "economically beneficial." But when the Tax Reform Act of 1986 reduced the amount of tax credits available to developers of certain hydropower projects, the staff came to the opposite conclusion.

Keating filed a revised proposal in 1987. His new plan moved the Rovana development penstock to a nearby mine access road. Keating believed this would reduce the project's impact on riparian vegetation to minor levels. He also proposed a post-construction monitoring plan. The Commission deferred immediate action on this new submission, and directed Keating to "reconsult with the pertinent resource agencies" and to submit information needed to evaluate the environmental impacts and economic benefits. The Commission pointed out that because the Pine Creek Project would be located within the Inyo National Forest, the Secretary of Agriculture—through the Forest Service—had authority to prescribe mandatory licensing conditions pursuant to § 4(e) of the Federal Power Act, 16 U.S.C. § 797(e).

In 1990, the Forest Service filed its comments, including a decision notice and an environmental assessment. The Service recommended denying Keating's application because all versions of the Pine Creek Project—Keating's original proposal, the Commission staff's modifications, and Keating's 1987 revisions—would be inconsistent with the Inyo National Forest Land and Resources Management Plan, adopted in 1988, pursuant to the National Forest Management Act of 1976, 16 U.S.C. § 1600 *et seq.* The Inyo Plan's Forest-wide Standards and Guidelines authorized new hydroelectric power facilities "when development of projects will allow streamflow sufficient to maintain resident trout fisheries, maintain

Visual Quality Objectives, and uphold wildlife and riparian resource objectives." Keating's project, the Forest Service believed, would not satisfy these requirements.

The Forest Service also submitted mandatory conditions for Keating's project, in the event that the Commission decided to license it. The conditions included minimum instream flows and a ban on diverting Pine Creek from September through April.[1]

An Environmental Assessment for the Pine Creek Project, issued by the Commission's staff in May 1990, also urged the Commission to deny Keating's application because the minimum flows required by the Forest Service's § 4(e) conditions made the project economically infeasible. The Assessment concluded that all the project alternatives were inconsistent with the Inyo Forest Plan's fishery and visual quality standards, even after the Forest Service's § 4(e) conditions were taken into account. The Commission staff asked Keating to respond to its economic analysis. He did so on September 13, 1990, stating that while he agreed that the project would not be economically feasible with the Forest Service's § 4(e) minimum flows, he disagreed with the conclusion that the project would conflict with the Inyo Forest Plan.

In October 1993, 11 years after Keating filed his original application, the Commission issued an order denying him a license for the Pine Creek Project, *Joseph M. Keating*, 65 F.E.R.C. ¶ 61,103. The Commission found that both of Keating's project proposals, as well as the staff's "alternative" proposal, were inconsistent with the purposes of the Inyo National Forest, and therefore the project could not be licensed. The Commission arrived at this conclusion by examining the Forest Service's Inyo Forest Plan. Congress, the Commission wrote, "has directed the Forest Service to develop Forest management plans to implement the legislatively prescribed purposes of all National Forests" and it was therefore appropriate for the Commission to "defer[ ] to the expertise of the Forest Service for a determination of the statutorily prescribed purposes of the Na-

tional Forests," and, more specifically, for a determination of the purposes of the Inyo National Forest. After the Commission denied his request for rehearing, *Joseph M. Keating*, 70 F.E.R.C. ¶ 61,240 (1995), Keating brought this petition for judicial review. The Department of Agriculture has intervened.

**II**

■ The Commission erred in deciding to defer to the Forest Service's judgment, based on the Service's management plan, that the Pine Creek Project would be inconsistent with the "purpose" of the Inyo National Forest. Section 4(e) of the Federal Power Act directs the Commission to consider not simply the "purpose" of the reservation, but the "purpose for which the reservation was created or acquired":

> [L]icenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation....

16 U.S.C. § 797(e).

The "consistency" portion of § 4(e) calls upon the Commission to make an historical inquiry. Yet the Inyo Forest Plan, on which the Commission relied, could hardly establish the purpose for which the Inyo National Forest was "created" in 1907. The Forest Service did not adopt the Inyo Plan until 1988. Forest management plans are not, in any event, aimed at reconstructing history. The plans, in compliance with 16 U.S.C. §§ 1600–1604, deal with the current and future administration of the national forests. This is why the Forest Service, when it submitted its comments on Keating's project, told the Commission that: "We have not determined whether the proposed project would interfere with or be inconsistent with

---

**1.** Keating filed an administrative appeal within the Forest Service and, in 1993, the Service

made minor revisions in the conditions it had filed.

the purposes for which the Inyo National Forest was created or acquired."

It is true that the "purposes" of today's national forests are different than purposes of national forests in 1907. Much of the change is due to the Multiple–Use Sustained–Yield Act of 1960. This legislation directed the Forest Service to manage such reservations "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. But in 1907, when the Inyo National Forest was "created," the Organic Administration Act of 1897, 16 U.S.C. § 475, allowed national forests "to be reserved for only two purposes": conserving water flows and furnishing a continuous supply of timber. *United States v. New Mexico,* 438 U.S. at 707, 98 S.Ct. at 3017. National forests in 1907 thus could not legally be established "for aesthetic, environmental, recreational, or wildlife-preservation purposes." *Id.* at 708, 98 S.Ct. at 3017.

The "consistency" provision in § 4(e) required the Commission to ask and answer two questions: (1) for what purposes was the Inyo National Forest created? and (2) would the Pine Creek Project interfere with or be inconsistent with those purposes? In Keating's case, the Commission asked and answered neither question. Instead, it treated § 4(e)'s "consistency" provision as if it depended on the Forest Service's § 4(e) "conditioning" power. Yet we know from *Escondido Mutual Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 775 n. 16, 104 S.Ct. 2105, 2112 n. 16, 80 L.Ed.2d 753 (1984), that the Commission must treat these different § 4(e) provisions separately. The Commission's interpretation of § 4(e) is at odds with *Escondido* and it fails to adhere to the statutory language. We thus find ourselves in agreement with *Rainsong Co. v. FERC,* 106 F.3d 269, 274 (9th Cir.1997), that the Commission erred in relying on a Forest Service evaluation, in a forest management plan, to determine whether a project would be consistent with the purposes for which the national forest was created. *See United*

*States v. New Mexico,* 438 U.S. at 713 n. 21, 98 S.Ct. at 3021 n. 21.

### III

■ Rather than resting its decision solely on the § 4(e) consistency rationale, the Commission offered an "additional and separate" ground for denying Keating a license—namely, that his project was uneconomical in light of the Forest Service's proposed § 4(e) conditions. Keating does not contest this conclusion. But he does dispute the validity of the conditions, which he claims are not necessary for or reasonably related to the protection of the Inyo Forest, and are arbitrary, capricious, and not supported by substantial evidence.

As construed in *Escondido,* 466 U.S. at 778–79, 104 S.Ct. at 2113, § 4(e) requires the Commission to attach to licenses those conditions thought necessary by the Secretary of the relevant department. Although "Congress intended that the Commission would have exclusive authority to issue all licenses, it wanted the individual Secretaries to continue to play the major role in determining what conditions would be included in the license in order to protect the resources under their respective jurisdictions." *Escondido,* 466 U.S. at 775, 104 S.Ct. at 2111. The language of § 4(e)—the license "shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation"—means that the validity of the conditions is up to the reviewing court, not the Commission. *See Escondido,* 466 U.S. at 778–79 & n. 21, 104 S.Ct. at 2113–14 & n. 21; *Bangor Hydro–Electric Co. v. FERC,* 78 F.3d 659, 662 (D.C.Cir.1996).

With respect to the Pine Creek Project, the Secretary—through the Forest Service—imposed two types of conditions. The first were "standard" provisions (conditions 1–4), giving the Service approval and oversight rights with respect to the project.[2] The Ser-

---

**2.** The standard conditions require: (1) that the licensee obtain from the Forest Service a special-use authorization before starting any activities the Service determines to be of a land-disturbing nature; (2) Service approval of the final design of parts of the project, if the Service thinks these will affect or potentially affect Forest Service land; (3) Service approval of changes to the

vice also attached project-specific conditions (conditions 5–23), imposing requirements such as minimum streamflows, a fish and wildlife mitigation plan, water quality monitoring, and visual resource protection.

■ Keating's initial objection is aimed collectively at all of the conditions, on the basis that the Forest Service failed to consider them "necessary for the protection of the purposes for which the reservation was originally created." Brief for Petitioner at 15. But unlike the Commission's "consistency" determination, the Secretary's conditioning power in § 4(e) is not so confined. This portion of § 4(e) speaks to the present and to the future—the Secretary imposes conditions deemed "necessary for the adequate protection and utilization" of the reservation. It is the reservation as it exists now, not the reservation as it existed years ago, that is to be protected and utilized. Since 1960, the Forest Service has had the responsibility of ensuring that national forests are maintained not only for timber and water, but also for outdoor recreation and for fish and wildlife. 16 U.S.C. § 528. Section 4(e) empowers the Forest Service to protect national forests against activities that would frustrate these congressionally-mandated objectives. In this respect, § 4(e) meshes with the National Forest Management Act, which demands that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i).

■ Under *Escondido*, a reviewing court must sustain § 4(e) conditions "if they are reasonably related to" protecting the national forest, "otherwise consistent with" the Federal Power Act, "and supported by substantial evidence." 466 U.S. at 778, 104 S.Ct. at 2113. Evidence supporting the conditions can consist of material presented to the Commission "either by the Secretary or other interested parties." *Id.* at 778 n. 20, 104 S.Ct at 2114 n. 20. Here, in fashioning the

conditions for the Pine Creek Project, the Forest Service relied on its own Environmental Assessment, an independent evaluation of instream flows conducted by Oak Ridge Laboratory, the Commission's 1986 Environmental Impact Study, and the Inyo Forest Plan. Keating concedes, as well he must, that the "specific conditions for the Pine Creek Project find some evidentiary support in the Forest Service documentation and the Inyo Forest Plan." Brief for Petitioner at 18. The conditions are nevertheless arbitrary and capricious, he argues, because they are different from conditions imposed on the relicense of a different project located on a different stream (Bishop Creek) in a different part of the forest. The Forest Service has a more than adequate response: Keating has not demonstrated that the two streams are identical in material respects; Pine Creek, as one of the last free-flowing streams in the Owens Valley, deserves greater protection than a stream already diverted by a hydroelectric plant; and new hydroelectric projects alter existing vistas, which the Inyo Plan is meant to protect. Keating also complains that the conditions duplicate provisions in standard Commission licenses, in the Federal Power Act, the Endangered Species Act, and the Clean Water Act. But we see nothing arbitrary in this. In the words of *Escondido*, Congress wanted the Forest Service "to play the major role in determining what conditions would be included in order to protect" the Inyo National Forest, 466 U.S. at 775, 104 S.Ct. at 2111. The fact that other laws or agencies might place Keating under the same legal obligations as the Service's conditions is no reason to set the conditions aside. The Forest Service has jurisdiction over the Inyo National Forest. If Keating were to construct and operate his hydroelectric project there, he rightly should have to answer to the Forest Service.

We reject Keating's attack on the standard conditions for the reasons given in *Southern California Edison Co. v. FERC*, Nos. 95–

---

project after initial construction; and (4) annual consultation with the Service with regard to "measures needed to ensure protection and development of the natural resource values of the project area." In another proceeding, the Commission found the first of these conditions to be

in conflict with the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 3096, and removed it from the license. *See Southern California Edison Co.*, 70 F.E.R.C. ¶ 61,130, at 61,354–55, *petition for review denied*, —— F.3d —— (D.C.Cir.1997).

1171 & 95–1206, decided today. We have considered Keating's other complaints about the conditions and reject them. Since Keating does not contend that the Commission erred in finding his project economically infeasible in light of the Forest Service's proposed § 4(e) conditions, we sustain the Commission orders on that ground alone. The petition for judicial review is therefore denied.

*So ordered.*