**Ashland COMPTON, Petitioner,**

v.

**INLAND STEEL COAL COMPANY and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 89-2943.

United States Court of Appeals,
Seventh Circuit.

Argued June 13, 1990.

Decided May 21, 1991.

Rehearing and Rehearing En Banc
Denied July 17, 1991.

Harold B. Culley, Jr., Raleigh, Ill., for petitioner.

Donald S. Shire, Sol. Gen., Dept. of Labor, Washington, D.C., John H. Secaras, Sol.Gen., Dept. of Labor, Chicago, Ill., Sylvia T. Kaser, Marta Kusic, Dept. of Labor, Black Lung Div., Linda Mikins, Benefits Review Bd., Dept. of Labor, Washington, D.C., Louis R. Hegeman, Jay D. Stein, Kathryn S. Mueller, Gould & Ratner, Chicago, Ill., for respondents.

Before CUMMINGS, COFFEY and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

For more than thirty years, Ashland Compton, the claimant in this case, worked in the southern Illinois coal mines near Carbondale. He spent seventeen of his coal-mining years underground. Now he works no longer; he has heart disease and black lung disease ("pneumoconiosis") and, according to his doctor, can barely climb a flight of stairs, let alone descend into a coal mine to perform hard labor. For health reasons, Compton stopped working and finally left his job at Inland Steel Coal Company ("Inland Steel") in May of 1985, after having been on sick leave for a year. In 1984, he brought a claim to the Department of Labor for benefits he asserted were due to him under the Black Lung Benefits Act, as amended, 30 U.S.C. §§ 901–945. The Deputy Commissioner of the Department of Labor's Office of Workers' Compensation Programs subsequently determined that Compton was eligible to receive benefits under the terms of the Act. However, his employer, Inland Steel, responsible for payment of benefits under the Act, contested its liability, causing Compton's claim to be forwarded to an Administrative Law Judge. The ALJ held a hearing in Carbondale on June 4, 1987, and issued a written

decision denying benefits on September 24, 1987. Compton appealed the ALJ's decision to the Benefits Review Board, which affirmed the ALJ.

Despite Compton's long career in the coal mines of Carbondale, the ALJ found that Compton failed to satisfy all three requirements of the regulations under the Act that serve as a precondition to the recovery of benefits. Compton came close, for the ALJ found (and it is uncontested here) that he satisfied the first two conditions. The regulations require that a miner, in order to receive black lung benefits, must first show that he has pneumoconiosis arising out of his employment in the mines. 20 C.F.R. § 718.203. According to a physician's report, ample proof existed that Compton suffered from pneumoconiosis. Moreover, because he served in the mines for ten years or more, Compton benefits from the rebuttable presumption contained in 20 C.F.R. § 718.203(b) that his pneumoconiosis arose out of his coal mine employment.

Next, Compton had to demonstrate that he was totally disabled within the meaning of 20 C.F.R. § 718.204. The ALJ found Compton to be totally disabled based on the result of an arterial blood-gas test and the medical assessment by his doctor, Dr. Rao, that Compton's pulmonary condition severely limited his physical abilities. According to Dr. Rao, Compton could walk only one-half block, could climb only two flights of stairs, could lift only fifty pounds, and could carry such a load for only fifty feet. In his testimony Compton asserted also that he had experienced difficulty breathing since 1980.

Compton therefore satisfied the first two preconditions for the recovery of benefits— he has black lung disease and is totally disabled. This only advances him two-thirds of the way toward recovery; he must also show that the "total disability is due to pneumoconiosis." 20 C.F.R. § 718.204(a). While Compton benefitted from the presumption that his pneumoconiosis arose from his employment in the mines, the applicable statute does not contain a similar presumption that his total

disability was due to pneumoconiosis. Nor did the ALJ find there to be any evidence that pneumoconiosis caused Compton's total disability. Therefore, the ALJ denied black lung benefits to Compton.

The crux of this coal miner's case is causation. In his decision denying benefits, the ALJ did not articulate the proper standard for determining whether Compton's total disability was due to pneumoconiosis. Compton, the Department of Labor, and Inland Steel each urge a different standard for determining whether a claimant satisfies the regulatory causation requirement. Our task then requires us to choose among the three to the extent that our precedents allow.

Before reaching the question of legal causation, we must parse the record below to determine what medical findings were made by the physician who examined Compton concerning the extent to which his disability was due to pneumoconiosis. First, it is uncontested that Compton has a totally disabling respiratory impairment. According to Dr. Rao's medical report, pneumoconiosis was not claimant's only malady, for Compton also suffers from heart disease. However, Dr. Rao's report discloses that Compton's pneumoconiosis was related to dust exposure from coal mine employment and furthermore, that it was one of the conditions that brought about the pulmonary impairment.

Dr. Rao, having diagnosed the presence of pneumoconiosis and heart disease, did not specify the degree to which Compton's impairment could be attributed to one or the other of the diseases. Because Dr. Rao did not spell out the chain of causation, the ALJ found no basis in the medical record for concluding that Compton's total disability was due to pneumoconiosis.

The ALJ arrived at this conclusion without articulating the appropriate standard of causation. The Benefits Review Board, on review of the ALJ's decision, attempted to set forth what it viewed as the proper nexus under 20 C.F.R. § 718. Citing *Wilburn v. Director, OWCP*, 11 Black Lung Reporter (MB) 1–135 (BRB 1988), the Board affirmed the ALJ's decision on the

grounds that Compton had failed to establish that pneumoconiosis, in and of itself, was totally disabling. The "in and of itself" language has become problematic, because, regardless of what the Benefits Review Board initially intended in articulating this standard, *Wilburn* now stands for the proposition that a miner who suffers from a totally disabling respiratory impairment related in part to coal mine employment and in part to some other disability (*e.g.,* smoking or heart disease) would be ineligible for black lung benefits under the Act. *Wilburn* held that a miner who suffers from pneumoconiosis and any other malady that contributes to his disability will be denied benefits because the sole cause of the disability is not pneumoconiosis.

■ Were this the applicable rule in this case, Compton, afflicted with both pneumoconiosis and heart disease, would be out of luck. However, the Board's reliance on *Wilburn* is misplaced. The "in and of itself" rule contravenes our precedents and has also been expressly repudiated by other circuits and by the Board itself, which reversed *Wilburn* in an *en banc* decision. *Scott v. Mason Coal Co.,* No. 88–1838 BLA (BRB June 22, 1990).[1]

Our starting point is the decision recently announced by this Court in *Shelton v. Director, OWCP,* 899 F.2d 690 (7th Cir. 1990). In *Shelton,* we reviewed in detail the proper standard for determining whether a miner's total disability was due to pneumoconiosis within the meaning of 20 C.F.R. § 718.204(a). Like Compton, the claimant in that case had dual afflictions, but in *Shelton,* the claimant was a lifelong smoker; he did not suffer from heart disease. The Court explored all of the possible meanings attributable to "due to pneumoconiosis." After rejecting *Wilburn*'s stringent requirement that pneumoconiosis be the sole cause of the claimant's disability, the *Shelton* Court focused on a more plausible formulation.

■ In order to satisfy the causation requirement, we held that pneumoconiosis must be a "contributing cause" of the total disability, such that "mining must be a necessary, but need not be a sufficient condition of the miner's disability." *Shelton,* 899 F.2d at 693. As Judge Posner explained, "if [Shelton] had not mined, he would not have become totally disabled, although he might have avoided the disability by care on some other front, for example, by not smoking." *Id.* The same analysis applies here: if the ALJ finds that Compton could have become totally disabled without having pneumoconiosis, then he does not recover. In the alternative, a miner's disabled condition may be caused only in part by pneumoconiosis. Under the rule of *Shelton,* if Compton did not also have heart disease, he might have escaped classification as totally disabled within the meaning of the Act.

*Shelton* establishes a workable, sensible framework for determining whether the causation requirement is satisfied so that a disabled miner can recover black lung benefits. *Shelton*'s utility has been proven already in this Court's decision in *Hawkins v. Director, OWCP,* 907 F.2d 697 (7th Cir. 1990). In *Hawkins,* the Court recognized that "[a]s *Shelton* makes clear, claimants must prove a simple 'but for' nexus to be entitled to benefits," *id.* at 701, and rejected a reading of *Shelton* that would require pneumoconiosis to be a "substantial contributing cause" of the total disability.

*Hawkins* explicitly declined to heighten a miner's burden further by requiring that he prove that pneumoconiosis was a "substantial" or "primary" cause of total disability. *Hawkins* reaffirms the result in *Shelton* that a miner need show only that he possesses a total pulmonary disability which is necessarily due in part to pneumoconiosis. The Court remanded the case to the ALJ to permit the claimant to make

---

1. The *Wilburn* rule also overlooks the possibility that Compton's twin afflictions may be linked— that his heart disease is an out-growth of his pneumoconiosis: "In advanced cases of [coal miners'] pneumoconiosis the patient becomes grossly disabled and death from cor pulmonale [heart disease] is usual." J.C. Houston, C.L. Joiner & J.R. Trounce, A Short Textbook of Medicine 304 (1985); cf. John Noble, Textbook of General Medicine and Primary Care 96 (1987).

such a showing under the proper *Shelton* standard.

With slight variation, other circuits mirror our approach to the causal question. The Tenth Circuit was the first to clarify the causation requirement for a miner to recover benefits:

> If the pneumoconiosis is at least *a contributing cause*, there is a sufficient nexus between the pneumoconiosis and the total disability to satisfy claimant's burden of proof. This standard is consistent with congressional intent of liberal assistance to totally disabled coal miners. It is also consistent with nearly twenty years of court interpretation of the Act in eight different circuits during the course of three sets of legislative amendments.

*Mangus v. Director, OWCP*, 882 F.2d 1527, 1531–1532 (10th Cir.1989) (emphasis in original). In requiring that pneumoconiosis be a contributing cause of a miner's total disability, the court declined to modify the causation requirement further by appending such "nebulous terms as 'significant' or 'substantial,'" *id.* at 1531, believing them to impose an inappropriately heavy burden. See also *Robinson v. Pickands Mather & Co./Leslie Coal Co.*, 914 F.2d 35, 38 (4th Cir.1990) ("[T]he formulation of the disability causation requirement that is easiest to apply and is most consistent with the remedial purpose of the Act is simply 'contributing cause.'").

The Third Circuit in *Bonessa v. United States Steel Corp.*, 884 F.2d 726 (1989), however, took a somewhat different tack. It also rejected the *Wilburn* approach, concluding, upon a review of Benefits Review Board precedents, that *Wilburn* imposed a stringent causation requirement unsupported by either the plain language of the regulation or the case law. *Bonessa* carved an intermediate path, interpreting the statute to mean that:

> one may not prove total disability due to pneumoconiosis simply by demonstrating the presence of any respiratory or pulmonary ailment. Rather a miner must show that pneumoconiosis is a *substantial contributor* to the disability.

*Bonessa*, 884 F.2d at 734 (emphasis supplied). In reaching its decision, the Third Circuit concluded that the interpretation of 20 C.F.R. § 718.204(c)(5), requiring that a miner, in order to recover, must have a "total disability due to pneumoconiosis," logically gave rise to the same interpretation as virtually identical language conditioning recovery of benefits by a miner's survivors only if they show "death due to pneumoconiosis." *Id.* at 733.

The court in *Bonessa* believed the plain language of the regulations conditioning benefits on a finding of "death due to pneumoconiosis" to be clearer than the regulations predicating benefits on a showing of "total disability due to pneumoconiosis." The court rested its belief on an additional provision, 20 C.F.R. § 718.205(c), defining the showing required for a deceased miner's survivors to recover black lung benefits. Section 718.205(c) conditions benefits on a showing that pneumoconiosis is a "significant contributor to a living miner's disability." *Id.* at 733. But this provision does not require a showing of "significant" contribution in all cases. The other four subsections of the regulation governing entitlement to benefits when death is due to pneumoconiosis mandate an award of benefits to survivors if any of the statutory presumptions are satisfied, 20 C.F.R. § 718.205(b)(3)–(4), or if "death was due to multiple causes including pneumoconiosis and it is not medically feasible to distinguish which disease caused death or the extent to which pneumoconiosis contributed to death," 20 C.F.R. § 718.205(b)(2). Despite the fact that a survivor can acquire benefits in several ways, the court in *Bonessa* seized upon the language in § 718.205(b)(2) and required that there be a "substantial nexus" linking the pneumoconiosis and the miner's disability. *Id.*

■ We agree with *Bonessa* insofar as it rejects *Wilburn* in favor of a more sensible rule. However, we decline to complicate unnecessarily the legal analysis by requiring that a miner show pneumoconiosis to be a "substantial contributor" to a miner's disability. Rather, we agree with the conclusion by the Tenth Circuit in *Mangus*,

followed by this Court in *Hawkins,* that a heightened showing imposes unnecessary burdens on claimants. Such a requirement inappropriately transforms a medical question into a legal question, since it is the attending physician who is best qualified to determine whether pneumoconiosis causes a miner's disability. The ALJ reviewing a claim should only examine the medical conclusion to determine whether the statutory threshold has been met. When a physician asserts that pneumoconiosis contributes to a miner's disability, ALJs should not be required to make a medical assessment whether pneumoconiosis *substantially* contributes to a miner's total disability. That is the job of the physician, not of the ALJ. Our approach, as explained in *Shelton* and *Hawkins,* reflects this.

■ By the same token, we cannot accept the concurrence's far-flung proposal requiring a miner to show that his pneumoconiosis caused at least 51% of his disability. This approach may seem seductive at first—proposing a numerical bright line in place of more flexible statutory language and the cases applying it. To its credit, the concurrence, in formulating the rule, rejects the stringent sole cause rule of *Wilburn,* recognizing that it has been uniformly rejected by other circuit courts. Concurrence at 490, citing *Lollar v. Alabama By–Products Corp.,* 893 F.2d 1258 (11th Cir.1990); *Adams v. Director, OWCP,* 886 F.2d 818 (6th Cir.1989); *Bonessa v. United States Steel Corp.,* 884 F.2d 726 (3d Cir. 1989); *Mangus v. Director, OWCP,* 882 F.2d 1527 (10th Cir.1989). However, the concurrence does not stop at *Wilburn;* it attempts to replace the "contributing cause" approach of our Court in *Shelton* and *Hawkins* with an unprecedented, more restrictive approach.

Under the concurrence's proposed rule, a determination that pneumoconiosis is a contributing cause of a miner's disability is not enough; a miner must be able to attribute 51% or more of his disability to pneumoconiosis. In identifying this numerical minimum, the concurrence draws principally upon its understanding of congressional intent in passing the 1981 amendments to the Black Lung Benefits Act and upon its novel definition of the word "primary". The concurrence states that a logical interpretation of the Act requires that pneumoconiosis be the "primary" cause of total disability and inserts "51 percent," concurrence at 490, in parentheses, as the meaning of the word "primary". The concurrence thus equates "primary" with 51 percent. In fact, neither the legislative history nor the precedents of this Court impute any such meaning to the word primary.[2] After conducting a painstaking tour of the legislative history, the concurrence concludes that the 1981 amendments to the Act were designed to tighten eligibility requirements and dramatically reduce disbursements to disabled miners. Concurrence at 488. The concurrence has quantified its reading of the legislative record by drawing a bright line, and it has justified this bright line by reference to comparative negligence in tort law. According to the concurrence, requiring a miner to quantify the causes of his disability is akin to a regime in tort in which "fact-finders routinely consider the percentage of fault of various parties in apportioning liability." Concurrence at 493.

The concurrence's black lung bright line, however, is unjustified, for a disabled miner's black lung benefits claim does not resemble a tort suit in a comparative negligence regime. A numerical bright line depends upon the ability of some factfinder, be it juror or judge, to assign a percentage to some act or condition with confidence that he or she is best positioned to make such an assessment. In a comparative negligence case, percentage fault reflects the extent to which a party bears legal responsibility for a tort.[3] Such a percentage can only be determined upon the con-

---

**2. Webster's Third New International Dictionary** defines primary as "something that stands first in order, rank, or importance." This is not the same as 51 percent. The more appropriate term for the concurrence's proposition is "majority," a word which is nowhere to be found in either our precedents or in the legislative history of the Act.

**3.** This is true of course in either modified or pure comparative negligence jurisdictions.

clusion of a trial or evidentiary hearing in which the plaintiff, on the one hand, has proven a *prima facie* case of tort liability, and the defendant has responded by presenting plausible tort defenses. After all the evidence is presented, the factfinder in a comparative negligence jurisdiction weighs the defenses against the *prima facie* case and apportions fault accordingly.

In contrast, the conclusion that pneumoconiosis accounts for 51% of a miner's total disability entails a medical judgment rather than a legal conclusion, and therefore properly remains within the purview of a treating physician rather than a legal factfinder. Not only does the 51% rule put the Benefits Review Board and the ALJ in the shoes of the doctor, requiring them to ascertain whether the 51% threshold has been passed, it also places doctors in the impossible position of accounting for the exact degree of impairment caused by pneumoconiosis. Doctors measure the extent of disease by identifying the presence of physical symptoms, not by assigning percentages. Under the proposed rule, pinpoint precision would be required in close cases. Doctors would be forced to decide whether pneumoconiosis accounts for 50% or 51% of a miner's disability. The validity of the physician's determination would then be subjected to the scrutiny of the ALJ and the Benefits Review Board—all of whom would be placed in the awkward position of second-guessing the doctor's estimate. The ALJ and the Benefits Review Board are ill-positioned to adjudge the relative presence of black lung disease in the body of a miner, for this entails a medical conclusion outside their expertise.

■ Not only does logic lead us away from the bright line; so does the applicable regulation. Section 718.204(c)(4) of the Code of Federal Regulations provides that where pulmonary function and/or blood-gas studies produce conflicting results, an ALJ can nevertheless find a miner to be totally disabled by relying on a "physician exercising reasoned medical judgment, based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 718.204(c)(4). In cases where ben-

efits are contingent upon the satisfaction of a statutory requirement, the ALJ's role is to review the medical determination to determine whether it falls within the purview of the statute. However, the ALJ should rely on the medical judgment—if, in the opinion of the doctor, pneumoconiosis contributes to a miner's disability, then he will recover; otherwise, he will not. To impose a numerical threshold obfuscates the essential inquiry and promotes distrust in a doctor's ability to exercise sound medical judgment.

In rejecting the mine operator's argument for a substantial contributing cause standard for recovery of benefits, the court in *Mangus* could find no evidence that either the plain language of the 1981 amendments or their legislative history "require a heightened causal relationship between a claimant's pneumoconiosis and his or her total disability." *Mangus*, 882 F.2d at 1532. Absent such support, the *Mangus* court refrained from legislating a more stringent standard and acknowledged that "[t]he creation of a higher standard is for someone other than the courts." *Id.*

■ In the case at hand, Compton's physician, Dr. Rao, concluded that Compton had pneumoconiosis and heart disease and that he was totally disabled. A lifetime non-smoker and a career coal miner, Compton now suffers from a respiratory ailment that totally disables him within the meaning of the Black Lung Benefits Act. We adhere to *Shelton* and *Hawkins* and again hold that so long as the ALJ concludes that, based on the medical evidence, pneumoconiosis is a contributing cause of a miner's disability, the miner will recover benefits. Such a determination is not for us, and we remand to the ALJ for application of the contributing cause standard.

COFFEY, Circuit Judge, concurring.

While I agree with the majority's determination that this case be remanded to the Administrative Law Judge, I disagree with its holding that the ALJ's consideration of this case on remand should be governed under the ambiguous, all-inclusive "contributing cause" standard established in *Shelton v. Director, OWCP*, 899 F.2d 690 (7th

Cir.1990) and *Hawkins v. Director, OWCP*, 907 F.2d 697 (7th Cir.1990). Under the *Shelton–Hawkins* standard, even if pneumoconiosis was as little as five percent of the cause of a miner's totally disabling condition, and other causes, such as heart disease, diabetes and cigarette smoking constituted the remaining ninety-five percent of the total disability, recovery of benefits would be permitted as long as the miner could demonstrate that coal-mine induced pneumoconiosis was "necessary" to his total disability. I am convinced that the *Shelton–Hawkins* standard fails to implement the congressional intent, explicit in the legislative history of the Black Lung Benefits Act, including its 1981 amendments, to limit the availability of benefits for disabilities "due to" pneumoconciosis to those miners who truly are totally incapacitated as a result of exposure to coal dust. In my opinion, the only way to effectuate Congress' intent to provide benefits to victims of black lung disease while maintaining the fiscal solvency of the Black Lung Trust Fund is to require a miner to demonstrate that pneumoconiosis constituted *at least 51 percent* of the cause of his total disability, not just that it was a "contributing cause," or more specifically, one of a number of contributing causes. In recommending the fifty-one percent causation standard in accordance with Congress' intent, I emphasize that I am referring to benefits recoverable under the Black Lung Trust Fund alone; the percentage standard would not effect Social Security benefits or any other benefits to which a miner may very well be entitled.

In considering the relevant but ambiguous statutory language, in particular the phrase "due to pneumoconiosis," [1] we must resort to legislative history to determine the clear congressional intent underlying this language. *See Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("Where ... resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statu-

tory language is unclear.") As the panel in *Hawkins* noted, the Black Lung Benefits Amendments of 1981 were "passed in response to the large deficit created in the Black Lung Trust Fund." 907 F.2d at 702 n. 8. The Black Lung Benefits Amendments of 1981 were a comprehensive package intended to *address a significant deficit in the Black Lung Trust Fund* and consisted of both increases in excise taxes on coal to augment the Fund's revenues as well as *tightening of eligibility requirements for black lung benefits* to limit the Fund's disbursements. *See* Pub.L. No. 97–119, 95 Stat. 635. The legislation also "restrict[ed] a claimant's ability to rely on statutory presumptions." *Hawkins*, 907 F.2d at 702 n. 8. Prior to the 1981 Amendments, "[a]rmed with the worker's compensation axiom that doubts are resolved in favor of the employee, claimants' counsels had great success in getting benefits for retired miners with fragmented work records." Lopatto, *The Federal Black Lung Program: A 1983 Primer*, 85 W.Va. L.Rev. 677, 700–01 (1983) (footnote omitted).

The legislative history of the Black Lung Benefits Amendments of 1981 clearly documents Congress' justifiable, serious concern with the Trust Fund's deficit, the motivating factor for the enactment of the amendments. As Congressman Rostenkowski, chairman of the House Ways and Means Committee, stated in the legislative debate: "This legislation represents the culmination of the efforts of many in the Congress, in the administration, and in the coal industry to restore the black lung disability trust fund to *fiscal solvency over a period of years.*" 127 Cong.Rec. 31,508 (1981) (emphasis added). The nature and impact of this deficit was noted in the Report of the House Committee on Ways and Means which stated:

> "For fiscal year 1981, it is estimated that the Fund expended $644 million for benefit payments net of reimbursements, $36 million for administrative expenses and $109 million for interest, for a total expenditure of $789 million. Coal excise

---

1. 30 U.S.C. § 921(a).

tax collections for fiscal year 1981 are estimated to have been $237 million, producing a deficit of $552 million for the year. Annual deficits of the Fund were $19 million in fiscal year 1978, $401 million in 1979 and $536 million in 1980. Thus, the cumulative deficit of the Fund at the close of fiscal year 1981 is estimated to be approximately $1.5 billion."

H.R. REP. No. 406, 97th Cong., 1st Sess. 4, *reprinted in* 1980–81 U.S.CODE CONG. & ADMIN.NEWS 2671, 2673. As Chairman Rostenkowski further noted in the floor debate, *"The projected deficit for 1995, absent this legislation would total $9 billion."* 127 CONG.REC. 31,508 (1981) (emphasis added). Congressman Rostenkowski also stated the basic reasons for the Trust Fund's growing deficit:

"This system was intended to be self-sustaining, but since its creation in 1978, coal excise tax receipts have never been able to meet trust fund expenditures. As a result the fund has had to borrow money from the general revenues of the Treasury. Since the trust fund must pay interest on advances from the Treasury at increasing rates, the deficit of the fund is growing."

*Id.*

As previously mentioned, one way Congress sought to remedy the *Trust Fund's grave financial problems was through the enactment of more stringent benefit eligibility requirements.* Congress decided to eliminate three of the presumptions[2] that could lead to a casual conclusion that a miner's total disability was due to pneumoconiosis, and, thus, took a major step toward remedying the Trust Fund's fiscal problem. In his remarks before the House of Representatives, Congressman Rostenkowski noted that "an important element in the effort to reform the black lung disability program *and to restore the Trust Fund to solvency involves changes in the eligibility standards...."* *Id.* (emphasis added). In hearings before the Senate Subcommittee on Labor of the Committee on Labor and Human Resources, Senator Orrin Hatch of Utah, made the following remarks concerning the relationship between the liberal eligibility requirements which existed before the 1981 amendments and the Black Lung Trust Fund's fiscal difficulties:

"The bill ... addresses what many regard as the *underlying reason for the trust fund's insolvency, the eligibility criteria.* Without question this has evoked tremendous controversy. Many have contended that the current criteria are simply too loose and that thousands of claimants who are not truly disabled have received benefits. Recent studies by the General Accounting Office have tended to confirm this. In 1980, *GAO reported that 88 percent of claims approved by the Social Security Administration were based on inadequate or conflicting medical evidence.* This year GAO has reported that its survey of Department of Labor-approved claims *revealed 84 percent of the cases were based on inadequate or conflicting medical evidence.*

"However, it is always easier to state the problem than to achieve a complete

---

**2.** The three presumptions abolished are: 1) a rebuttable presumption that "[i]f a deceased miner was employed for ten or more years in one or more coal mines and died from a respirable disease ... his or her death was due to pneumoconiosis," 20 C.F.R. § 718.303; 2) "a miner [who] was employed for fifteen years or more in one or more underground coal mines" whose x-rays do not show pneumoconiosis has a rebuttable presumption that his or her total disability is due to pneumoconiosis "if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment," 20 C.F.R. § 718.305; 3) the eligible survivors of "a miner who died on or before March 1, 1978, who was employed for 25 or more years

in one or more coal mines prior to June 30, 1971 ... shall be entitled to the payment of benefits, unless it is established that at the time of death such miner was not partially or totally disabled due to pneumoconiosis." 20 C.F.R. § 718.306.

There are still two presumptions remaining in effect today. 30 U.S.C. § 921(c)(1) establishes a rebuttable presumption that pneumoconiosis in a person who was employed in coal mines for at least ten years "arose out of such employment." 20 C.F.R. § 718.302. Section 921(c)(3) establishes an irrebuttable presumption that specified results of medical tests demonstrate death or disability due to pneumoconiosis. 20 C.F.R. § 718.304.

solution. The bill, as developed under the guidance of the Department of Labor, *reflects a consensus among the interested parties of what eligibility changes are needed to restore this as a disability program, and no longer a pension program."*

*Black Lung Benefits and Revenue Amendments of 1981: Hearing Before the Subcommittee on Labor of the Committee on Labor and Human Resources, United States Senate on S. 1922,* 97th Cong., 1st Sess. 10–11 (1981) (emphasis added) (hereinafter Subcommittee on Labor).

The debate over the Black Lung Benefits Act on the Senate floor evoked a serious concern among senators that the legislation's eligibility changes had not gone far enough in addressing the abuses caused by the program's prior all-too-permissive eligibility criteria. Senator Chaffee, from Rhode Island, a reluctant supporter of the amendments, stated:

"When we debated this in 1977 I made it very clear that those who are entitled to black lung benefits should receive black lung payments. There is no argument over that.

*"But the trouble is that this program has become a compensation program for the dangers that are inherent in coal mining.*

"If we want to recognize that, let us do it. Let us say this is an extremely dangerous occupation, that coal miners die from a whole series of accidents, and we in Congress feel there should be some type of compensation for the widows and orphans of those who so died. Let us recognize that. I do not mind that. Let us proceed down that path.

*"But let us not say we are going to provide universal compensation for everyone associated with the coal business under the guise of saying they have black lung disease or that someone associated in their family has. That is what this program has become,* as illustrated by the fact that if one dies from an accident in the mine after service x number of years, his widow is entitled to black lung payments when there is no causal connection whatsoever with black lung disease."

127 CONG.REC. S15479 (daily ed. Dec. 16, 1981) (emphasis added). Similarly, Senator Long, another reluctant supporter of the legislation, stated:

"[T]he problem here is very similar to the problem we have in regard to the disability insurance program. When we enacted that program we assumed that the cost would be well within the tax we levied. A few years later *we found the costs were exceeding the original estimates by about four to one, and the reason was not that there was anything wrong with the estimate; the reason was that both the administrators and the courts had combined to place all sorts of people on those disabilities rolls whom Congress had never intended to put there.*

"They are tightening up on the program, tightening up on the administration, and in doing so they have brought the program within the revenues that are being raised.

"It is impossible to have a program of this sort *without bankrupting the Government, unless someone takes the hard-nosed position—I say hard-nosed, by that I mean it is a tough position— about this matter, that we are not going to pay the benefits where they were not intended,* as has [Senator Chaffee], and as I have tried to do. Not that I do not have complete sympathy with those who have a marginal impairment to their health; *but unless one carefully considers the views of the taxpayers and the problems of those paying the cost, these social welfare programs can be extended to all sorts of people whom no one ever intended to be placed on those rolls.*

"That is the problem. There is no doubt that even under this bill, in my judgment, this program will continue to have more beneficiaries for the size of the program than Congress ever intended to fund or finance as compared with any other program.

"I hope when we take a look at this matter next year and in succeeding years

we will insist, as the Finance Committee has tried to insist in regard to disability, that this program be limited to what Congress had in mind when it became involved in this."

127 CONG.REC. S15481 (daily ed. Dec. 16, 1981) (emphasis added). Senator Nickles, who headed the Committee on Labor and Human Resources, which had held hearings on the eligibility criteria, responded understandingly to the concerns these senators expressed:

"[W]hat we wanted to do by the hearing was to consider recommendations proposed by the administration to *tighten up eligibility and to eliminate the fraud and abuse that proliferated in the black lung program certainly since its inception, but even more importantly, since the amendments of 1972 and 1977.*

"The changes that we made ... are prospective only. In other words, they will not affect claims that are already in the pipe line but they will only affect claims that will be coming in the future.

\* \* \* \* \* \*

"We eliminated three presumptions.

\* \* \* \* \* \*

"*GAO reported a study where they found 88 percent of the persons who were receiving black lung benefits under the Social Security Administration could not substantiate that they had black lung disease.*

\* \* \* \* \* \*

"I personally have some reservations. I wish we could have gone further.

"I think Senator Randolph will agree we have been able to come up with a program that can be passed on both sides of Congress, a program that needs to be tightened up. At least we will be taking a step to tighten up to see that these abuses will not continue, at least at the same rate they have continued in the past.

\* \* \* \* \* \*

"Senator Chaffee, Senator Domenici, Senator Long, and others have men-tioned that we need to go further, and I wholeheartedly concur.

"Additional changes need to be made in definitions. We need to redefine who miners are again. It was greatly liberalized in the past. *We need to change the definition of the black lung disease itself. We also need to further redefine 'total disability.'*

"With those definition changes and a few other changes that have been discussed, and hopefully with a positive amendment such as that offered by Senator Long that is not in this bill that would set a definite time and from that time no longer could the Treasury continue to make advances to this program, I think we will make some positive changes in *getting this program off the backs of the general taxpayers and at least onto the coal operators and to the coal industry where it rightfully belongs.*

"I can tell the Members of this body that certainly the committee of which I am chairman, the Labor Subcommittee, our committee continues *and will continue to look into the black lung program and will make every endeavor we possibly can to ensure that benefits, particularly those benefits paid in the future, will only go to those coal miners who are truly disabled by complicated pneumoconiosis, black lung.*"

127 CONG.REC. S15494–95 (daily ed. Dec. 16, 1981) (emphasis added).

In signing the legislation his administration had originally proposed, President Reagan commented:

"I am pleased to sign into law H.R. 5159, which contains the 'Black Lung Benefits Revenue Act of 1981' and the 'Black Lung Benefits Amendments of 1981.' This bill embodies this administration's comprehensive black lung reform proposals.

\* \* \* \* \* \*

"*A major purpose of this legislation is to restore solvency to the Black Lung Disability Trust Fund. At present the Fund had a deficit of approximately $1.5 billion. With no change in the*

*law, the deficit would climb to $7 billion over the next ten years.* The bill addresses the revenue side of this problem by temporarily doubling the excise taxes on coal producers, but requiring that those rates revert to their present levels when the Fund becomes fully solvent, and in no case later than the end of 1995.

*"The bill also addresses eligibility criteria and benefit payments for the black lung program. These changes are needed to assure that the black lung program will provide adequate workers' compensation benefits to coal miners suffering from black lung disease, while reducing the potential for substantial abuses."*

Statement on Signing H.R. 5159 into Law, 17 WEEKLY COMP.PRES.DOC. (Dec. 29, 1981) (emphasis added). It is clear that the President and the members of Congress, practicing fiscal responsibility in enacting the 1981 amendments, sought to rein in and control black lung benefits eligibility in the future. In fact, the primary question raised in congressional debate was whether the amendments were stringent enough to adequately stem the tide of granting black lung benefits to questionable applicants, a practice devastating to the financial solvency of the black lung benefits program.

It is evident that the "due to" pneumoconiosis language in the Black Lung Benefits Act was initially interpreted in its logical sense of being the "primary" cause (51 percent) of total disability. In *Peabody Coal Co. v. Benefits Review Bd.*, 560 F.2d 797, 801 (7th Cir.1977), we relied upon the Social Security Administration (SSA) regulations[3] to hold that pneumoconiosis must be the *primary* cause of the claimant's disabling respiratory ailment in order to establish his entitlement to black lung benefits: "The regulations specifically direct the fact finder to determine that a miner is under a disability 'only if his pneumoconio-

sis is ... *the primary reason for his inability to engage in ... comparable and gainful work. Medical impairments other than pneumoconiosis may not be considered.*' 20 C.F.R. § 410.426." *Id.* (emphasis added). While we did not specifically address the definition of "due to" in *Peabody Coal,* the regulation at 20 C.F.R. § 410.426, "Determining Total Disability," is included in Subpart D of the regulations, "Total Disability or Death Due to Pneumoconiosis." Hence, it is only logical to infer that the SSA intended that the statutory language of "due to" should be interpreted as at least 51 percent of the causation.

In accordance with the 1972 Amendments, the SSA promulgated more liberal interim rules for certain claims "filed by a miner before July 1, 1973, or by a survivor where the miner died before January 1, 1974." 20 C.F.R. § 410.490. Under the § 410.490(b) interim presumption, the chronic respiratory or pulmonary disease of a miner who worked underground for at least fifteen years was "presumed to be due to pneumoconiosis." This presumption allowed a miner or his survivors to receive benefits even though "ventilatory studies [merely] establish[ed] the presence of a chronic respiratory or pulmonary disease" but were inconclusive as to the presence of black lung disease.

The Black Lung Benefits Reform Act of 1977 further liberalized the eligibility requirements for receiving black lung benefits and even provided for a review of claims denied under the 1969 and 1972 laws. *See* DeCarlo, *The Federal Black Lung Experience,* 26 How.L.J. 1335, 1342 (1983). The 1977 Act also created the Black Lung Disability Trust Fund to be financed by an excise tax on coal in order to "shift the burden of the ... program from the government to the coal industry, as was the original intent of the 1969 legislation." *Id.* at 1343.[4] The Trust Fund was

---

**3.** Administration of the Black Lung Benefits Act was assigned to the SSA from the enactment of the bill in 1969 through January 1, 1974, when it was transferred to the Department of Labor.

**4.** The legislative history of the 1969 Act manifests that Congress envisioned it as a temporary

emergency measure that would be replaced by the states in their own state-funded workers' compensation plans. *See, e.g.,* Comments of Congressman Dent (a cosponsor of the bill), House Debate on Coal Mine Health and Safety Act (Oct. 27, 1969), *reprinted in* Legislative His-

found to be inadequate to meet the financial burden placed on the federal government resulting from the passage of the more liberal eligibility requirements in the 1977 Act. The inadequacy of the Trust Fund to meet the obligations incurred resulting from the more liberal eligibility standard is evidenced in the approximately $1.5 billion deficit at the end of fiscal year 1981, only three years after the establishment of the Fund. The eligibility requirements were so lax, that as Senator Nickles noted, "[i]n 1980, GAO reported a study where they found 88 percent of the persons who were receiving black lung benefits under the Social Security Administration *could not substantiate that they had black lung disease.*" 127 CONG.REC. S15493–94 (Daily ed. Dec. 16, 1981) (emphasis added). Senator Long stated that the problem with the black lung benefits budget was similar to that under the disability insurance program where *"the reason [for the fiscal problems] was that both the administrators and the courts had combined to place all sorts of people on those disability roles whom Congress had never intended to put there."* 127 CONG.REC. S15481 (Daily ed. Dec. 16, 1981) (emphasis added). Congress clearly intended to eliminate such egregious abuses of the system in the 1981 Amendments. As Congressman Rostenkowski explained, "an important element in the effort to reform the black lung disability program and to restore the Trust Fund to solvency involves changes in the eligibility standards...." 127 CONG.REC. 31,508 (1981). Senator Orrin Hatch stated that the 1981 "bill ... addresses what many regard as the underlying reason for the Trust Fund's insolvency, the eligibility criteria.... The bill, as developed under the guidance of the Department of Labor, reflects a consensus among the interested parties of what eligibility changes are needed to *restore this as a disability program, and no longer a pension program.*" Subcommittee on Labor, *supra* at 10–11 (emphasis added). Similarly, the Chairman of the Committee on La-

bor and Human Resources, Senator Nickles, stated that

"what we wanted to do by the hearing was to consider recommendations proposed by the administration to *tighten up eligibility and to eliminate the fraud and abuse that proliferated in the black lung program certainly since its inception, but even more importantly, since the Amendments of 1972 and 1977.*

\*    \*    \*    \*    \*    \*

We need to change the definition of the black lung disease itself. We also need to further redefine 'total disability.'

\*    \*    \*    \*    \*    \*

I can tell the Members of this body that certainly in the committee of which I am chairman, the Labor Subcommittee, our committee continues and will continue to look into the black lung program and will make every endeavor we possibly can to insure that benefits, particularly those benefits paid in the future, will only go *to those coal miners who are truly disabled by complicated pneumoconiosis, black lung.*"

127 CONG.REC. S15494–95 (Daily ed. Dec. 16, 1981) (emphasis added). From these statements and others recited above, it is clear that Congress intended to eliminate the abuses of the Black Lung Benefits Act caused by the 1972 and 1977 Amendments when it passed the 1981 Amendments. Yet the majority's enunciated "contributing cause" standard fails to carry out this purpose. How can a standard that would allow full benefits to a miner whose total disablement "due to" pneumoconiosis was a mere 5 percent prevent the abuses decried by Congress during the debates on the 1981 Amendments and provide financial stability to the Trust Fund? In short, it cannot. In order to curb the abuses brought about through the liberalizing amendments in 1972 and 1977, the standard more logically should be the same as the one promulgated under the authority of the

tory Federal Coal Mine Health and Safety Act, Committee on Education and Labor 719 (March 1970). No state has enacted workers' compen-

sation legislation for pneumoconiosis that meets the standards articulated in the Black Lung Benefits Act.

SSA, that pneumoconiosis must be the primary reason (51 percent), but acknowledging that it need not be the exclusive cause, of the miner's total disability. *See* 20 C.F.R. § 410.426. I believe that over 50 percent is the clear intent expressed by Congress in debating and passing the 1981 Black Lung Benefits Amendment. If Congress actually prefers some standard lesser than at least 51 percent, it should clearly state so.

While I am sympathetic with the needs of those who suffer from the disabling conditions of pneumoconiosis, where their total disability is primarily attributable to sources other than pneumoconiosis, I am obligated to comply with the congressional mandate as set forth in the legislation and explained in the legislative history and deny coverage under the Black Lung Benefits Act. Where Congress has clearly expressed its intent to limit recovery of black lung benefits to cases where pneumoconiosis is the primary (51 percent) source of total disability, the courts are required to follow its dictates.

In response to the 1981 Amendments, the Benefits Review Board, in its 1988 decision in *Wilburn v. Director, OWCP*, 11 B.L.R. 1–135 (1988), established a most difficult burden of proof for a miner attempting to demonstrate that his total disability was "due to" pneumoconiosis. The Board held that a claimant has the "burden of establishing that his pneumoconiosis ... is in and of itself, totally disabling." *Wilburn*, 11 B.L.R. at 1–138. In my view this test is more stringent than necessary to effectuate the congressional intent. The "in and of itself" standard implies that pneumoconiosis must be 100 percent of the cause of total disability as opposed to the congressional intent of at least 51 percent.

Although the *Wilburn* standard might very well be interpreted as implementing the congressional intent, Courts of Appeals have been uniform in their disapproval. In *Hawkins*, 907 F.2d at 700–06, the panel thoroughly chronicled the history of the rejection of the *Wilburn* "in and of itself" standard of proof in decisions in the Eleventh Circuit, Sixth Circuit, Third Circuit and Tenth Circuit. *See Lollar v. Alabama By–Products Corp.*, 893 F.2d 1258 (11th Cir.1990); *Adams v. Director, OWCP*, 886 F.2d 818 (6th Cir.1989); *Bonessa v. United States Steel Corp.*, 884 F.2d 726 (3d Cir. 1989); *Mangus v. Director, OWCP*, 882 F.2d 1527 (10th Cir.1989). These courts held that the *Wilburn* "in and of itself" standard was inappropriate for interpreting the burden the Black Lung Act places upon a miner seeking to demonstrate that his disability was "due to" pneumoconiosis, as it was not the intent of Congress that a miner establish that pneumoconiosis is the sole cause of his total disability. For example, the Sixth Circuit in *Adams* noted that "[a]pplication of the in and of itself formulation ... would effectively return the miner, who is concededly suffering from pneumoconiosis and a totally disabling respiratory impairment, to an oppressive burden of proof...." 886 F.2d at 825. As an alternative to the "in and of itself" standard, the Sixth and Tenth Circuits took a very unrestrictive approach that a miner must only establish that pneumoconiosis was a "contributing cause" of total disability, thus benefits conceivably could be awarded when pneumoconiosis was a mere three or five percent of the cause of total disability, which clearly was not the intent of the legislative body. *See Adams, Mangus.* However, the Third and Eleventh Circuits, relying on an analogy to pneumoconiosis death benefit cases, held that the higher, but ambiguous, standard of "substantial contributory cause" required under 20 C.F.R. § 718.205(c)(2) was applicable to the total disability causation issue. *See Lollar, Bonessa.* But, these courts failed to clearly delineate a definitive quantum of causation necessary for a miner to establish that pneumoconiosis was a "substantial contributory cause"[5] of his total disability.

This Court became the fifth Court of Appeals to consider the burden of proof issue in *Shelton v. Director, OWCP*, 899

---

**5.** I note that I believe "substantial contributory cause" could be argued as meaning at least 51 percent.

F.2d 690 (7th Cir.1990). There a panel of this Court joined other Courts of Appeals in rejecting the Benefits Review Board's "in and of itself" standard, noting that under this test "mining would ... be the sole cause, to which 'in and of itself' seems to point." *Shelton*, 899 F.2d at 693. In adopting the all-inclusive "contributing cause" standard, the panel characterized it as requiring "that mining must be a necessary, but need not be a sufficient, condition of the miner's disability; if he had not mined, he would not have become totally disabled, although he might have avoided the disability by care on some other front, for example by not smoking." *Id.* at 693.

In *Hawkins v. Director, OWCP*, 907 F.2d 697 (1990), another panel of this Court considered the burden of proof issue. The panel endorsed the *Shelton* standard and held that under *Shelton* it was unnecessary for a claimant to prove that "pneumoconiosis was the 'substantial' necessary cause o[r] the 'primary' necessary cause of the miner's total disability." *Hawkins*, 907 F.2d at 705. In contrast to the legislative intent outlined in this decision, the panel held that the miner was only required to demonstrate that "his pneumoconiosis was a necessary (but not sufficient) cause of his total disability." *Id.* at 707. Thus, even if pneumoconiosis was a mere one or five percent of the cause of total disability, recovery of benefits is possible. Under *Hawkins*, it would appear that a miner need only establish that pneumoconiosis contributed to his total disability and that he would not have become totally disabled had he not worked in a coal mine. The *Hawkins* panel, in failing to comply with the legislative intent, does not require a miner to demonstrate that pneumoconiosis was the "primary cause" of the miner's total disability. *See Hawkins*, 907 F.2d at 705–06.[6] This is clearly in contrast with the regulation promulgated under the authority of the SSA, which prohibited consid-

eration, for purposes of determining total disability, of the unrelated medical problems that may now constitute 95 or perhaps even up to 99 percent of the cause of a miner's total disability. *See* 20 C.F.R. § 410.426 ("Medical impairments other than pneumoconiosis may not be considered.").

I am convinced that a more definitive standard than "contributory cause" is required to carry out the legislative intent of the Act's requirement that total disability be "due to" pneumoconiosis, particularly in view of the congressional intent underlying the 1981 amendments to the Black Lung Benefits Act. As noted above, Congress desired that only those who actually suffered from a clearly medically documented total disability with over 50 percent due to coal-dust induced pneumoconiosis should recover black lung benefits. As the panel in *Shelton* recognized, the Black Lung Benefits Act "is not a welfare program for cigarette smokers." *Shelton*, 899 F.2d at 693. I believe that the ordinary meaning of the phrase "due to" pneumoconiosis requires not only that pneumoconiosis be one of the causes of total disability, but furthermore that it be *at least 51 percent* of the cause of a miner's total disability if we are to comply with the congressional mandate as reflected in the legislative history. Otherwise, the miner's condition was not really "due to" pneumoconiosis, but may very well have been documented to be "due to" a number of other medical problems and/or physical infirmities, such as cigarette smoking, alcoholism, hypertension, kidney failure, asbestos-related diseases, heart disease or diabetes. The *Shelton–Hawkins* standard would permit recovery of pneumoconiosis benefits in cases where coal-mine induced pneumoconiosis was as little as or less than five percent of the cause of total disability, as long as one could prove it was "necessary" to the min-

---

**6.** In a recent decision the Fourth Circuit adopted a "contributing cause" standard and announced its endorsement of *Shelton*'s limitation of recovery to cases where pneumoconiosis was a "necessary" cause of the miner's total disability. *See Robinson v. Pickands Mather & Co.*, 914 F.2d 35, 38 (4th Cir.1990). *See also*

*Hobbs v. Clinchfield Coal Co.*, 917 F.2d 790 (4th Cir.1990) (following *Robinson* ).

The Benefits Review Board has also abandoned the "in and of itself" standard and replaced it with a "contributory cause" standard of proof. *See Scott v. Mason Coal Co.*, 14 B.L.R. 137, 139 (1990).

er's total disability. Thus, a miner could receive benefits even in a case where his total disability was fifty-five percent attributable to cirrhosis of the liver, forty percent to cancer of the pancreas and a mere five percent attributable to pneumoconiosis. I am convinced that while Congress intended to provide black lung benefits to each and every deserving miner, its purpose was to require a miner to establish that black lung disease is the primary source of his total disability and not just one that can more properly be described as a contributing cause. If we are to protect the assets of the Fund for worthy claimants whose total disability is actually caused by pneumoconiosis attributable to coal mining, as Congress has mandated, the mere fact of having been employed in a coal mine should not be a basis for recovery of disability benefits when the medical evidence present fails to establish that pneumoconiosis was at least the major (51 percent) contributing cause of a miner's total disability.

All of the current causation standards are too ambiguous to provide consistent results regardless of which of the following tests courts adopt:

> "Necessary (but not sufficient) cause," *Hawkins v. Director, OWCP*, 907 F.2d 697 (7th Cir.1990);
>
> "Contributing cause," *Shelton v. Director, OWCP*, 899 F.2d 690 (7th Cir. 1990);
>
> "Substantial contributing cause," *Bonessa v. United States Steel Corp.*, 884 F.2d 726 (3rd Cir.1989).

The problem with these standards is that they transform the causation analysis into a subjective guessing game. At what point does pneumoconiosis become "necessary" to a miner's total disability? One judge may think it was a "necessary" cause at one percent while another thinks it is thirty or fifty percent. What does "contributing cause" mean? Again, one ALJ or Benefits

Review Board may think pneumoconiosis was a "contributing cause" if only one percent of the miner's total disability was due to black lung disease, and another ALJ may think a higher percentage is needed. Finally, what is "substantial?" One reasonable person might think five percent causation is "substantial" while another thinks that "substantial" means over fifty-five percent. Given the inherent ambiguity of these standards, ALJs and the Benefits Review Board are operating in a vacuum of subjective speculation (substantial—three percent, thirty percent or fifty-one percent?) when deciding whether a miner's total disability is "due to" pneumoconiosis. Thus, we should adopt the fifty-one percent standard in fairness to claimants, the government, coal-mine operators and the courts as well as in fairness to the tax-paying public who have had to join in bearing the burden of paying the benefits when there is a deficiency in the Trust Fund.

In light of the foregoing, I reject the suggestion of the majority and of the Tenth Circuit in *Mangus v. Director, OWCP*, 882 F.2d 1527, 1532 (10th Cir.1989), that there is "no evidence that either the plain language of the 1981 amendments or their legislative history 'require a heightened causal relationship between a claimant's pneumoconiosis and his or her total disability.'" Majority Opinion at 483 (quoting *Mangus*, 882 F.2d at 1532).[7] The *Mangus* Court's statements were a mere conclusion that neither tracked nor conducted an extensive analysis of the legislative history as undertaken above. The statutory language, together with its legislative history, leads to the conclusion that the Black Lung Benefits Act requires that a miner demonstrate that his pneumoconiosis lung damage was at least 51 percent of the cause of the miner's total disability.

In reviewing the history of the development of the standard of proof required to demonstrate total disability "due to" pneu-

---

**7.** The Court's decision in *Shelton*, as it reads, did not consider legislative history. The decision in *Hawkins* made a brief notation of the *Mangus* Court's discussion of legislative history and also noted that the Black Lung Amendments "were passed in response to the large

deficit created in the Black Lung Trust Fund." 907 F.2d at 702 n. 8. The *Hawkins* Court did not undertake an extensive consideration of the relationship of the legislative history to the causation test as set forth herein.

moconiosis, I note that one of the primary difficulties is that the courts and the Benefits Review Board seem to have taken almost "extreme" positions on either side of the causation issue. The Benefits Review Board's "in and of itself" standard was a very restrictive "sole" cause requirement fraught with problems because it ignored the reality that there will be few cases in which one can legitimately label pneumoconiosis as the "sole" cause of total disability. The "in and of itself" standard was unjustifiably extreme, for Congress merely intended that pneumoconiosis be the primary (over 50 percent) cause of total disability, not the sole cause. But, I believe the "contributing cause" formulation some of the courts have adopted in reaction to *Wilburn* has swung the pendulum to almost the opposite extreme and is too permissive and requires only that the miner make a minimal demonstration of some relationship between pneumoconiosis and total disability. Congress certainly was aware of and would have implemented the Act with the words "contribute to" rather than "due to" had it intended that benefits be awarded when a miner demonstrates only that pneumoconiosis contributed to his total disability. *See Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984) ("it should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses...."); *Jones v. Hanley Dawson Cadillac Co.*, 848 F.2d 803, 807 (7th Cir. 1988) ("we must assume that Congress understood the meaning of the words it incorporated into the Odometer Act...."). I am convinced that Congress' clear intent to preserve the integrity of the Black Lung Benefits Trust Fund is most properly effectuated through a requirement that pneumoconiosis constitute *at least 51 percent* of the cause of a miner's total disability.

I am aware of and disagree with the *Hawkins* panel's favorable citing of lan-

guage in the Tenth Circuit's decision in *Mangus*, which "noted that any standard greater than contributing cause (such as 'substantial' or 'significant' contributing case) would place an inappropriately heavy burden on claimants because it would be extremely difficult for the claimant who may have a number of disabilities to prove 'the relative quantification of the various causal elements.'" *Hawkins*, 907 F.2d at 702 (quoting *Mangus*, 882 F.2d at 1531). Is it the prerogative of the legislature or the Courts to determine policy? Let us reflect on our decisions and ask ourselves, "are we making the Black Lung Benefits Act into a pension program or are we really following the congressional intent and restoring this as a disability program?" Subcommittee on Labor, *supra* at 11. Any difficulty in quantifying the various causal elements of a miner's total disability does not in my view present a major obstacle to the adoption of the percentage causation standard set forth herein. Rather, I am convinced that the congressional intent encompassed a willingness to require that the claimant establish the relative causes of total disability through competent medical testimony and data. In the forty-four jurisdictions that have adopted comparative negligence legislation, evaluation of relative fault is an accepted practice which has not proved to be an obstacle in the determination of recovery of benefits to triers of fact, whether they be one-time lay jurors or experienced trial judges.[8] For example, in the jurisdictions that have adopted comparative negligence, fact-finders routinely consider the percentage of fault of various parties in apportioning liability. Certainly, an administrative law judge dealing with black lung cases should be able to effectively determine the relative percentage of various sources contributing to a miner's total disability after analyzing and weighing the medical and other testimony. The ALJ is expected to do more than simply routinely approve and rubber stamp physi-

8. "As of 1982, some 40 states had adopted some general form of comparative negligence." *Prosser and Keeton on the Law of Torts*, 471 (W.P. Keeton 5th ed. 1984). "Since 1982, Arizona, Delaware, Kentucky and Missouri have switched to comparative fault." *Prosser and Keeton* at 74 n. 30 (5th ed. 1988 Supp.). Thus, as of 1988, 44 states had adopted a form of comparative negligence.

cians' determinations that a miner's total disability is due to pneumoconiosis. Furthermore, I would note that even the "necessary" cause standard of *Shelton* and *Hawkins* would require some quantification of relative causes of total disability because the miner must establish that he would not have become totally disabled had he not been employed in the coal mine.

The final sections of the majority's opinion recite a litany of non-meritorious criticisms of requiring that pneumoconiosis constitute at least 51 percent of the miner's total disability. Initially, the majority suggests that the "percentage" standard establishes "a numerical bright-line in place of more flexible statutory language...." In fact, the majority's all-inclusive standard creates a veritable lawyer's paradise that will likely spawn a litigation explosion of non-meritorious claims (claims of total disability that are not really "due to" pneumoconiosis) presented to ALJs who have no clearly delineated standard for the rendering of consistent, well-reasoned judgments. Moreover, the majority's argument ignores the fact, established earlier in this opinion, that the "51 percent" test implements rather than abrogates the statutory language as interpreted in light of legislative history. Indeed, the legislative history underlying the Amendments to the Black Lung Benefits Act clearly establishes that Congress did not desire its legislation to be interpreted to permit nondeserving miners to recover black lung benefits.

The majority goes on to criticize any causation requirement more restrictive than that utilized in *Shelton* or *Hawkins*, including the "percentage" approach, with the assertion that "[s]uch a requirement inappropriately transforms a medical question into a legal question, since it is the attending physician who is best qualified to determine whether pneumoconiosis causes a miner's disability." The majority urges that, unlike the question of apportionment of fault in a comparative negligence case, "the conclusion that pneumoconiosis accounts for 51% of a miner's total disability entails a medical judgment rather than a legal conclusion, and therefore properly remains within the purview of a treating physician rather than a legal fact finder." Majority at 483. I fail to comprehend the reasoning or logic in the contention that use of the "percentage" causation requirement as used in the vast majority of courts in this country "transforms a medical question into a legal question." Certainly a trained physician's medical judgments are a factual source for the ALJ's determination of legal cause. But irrespective of whether a miner is required to demonstrate that pneumoconiosis was a "contributing cause," "substantial contributing cause" or "at least 51 percent" of the cause of his total disability, the ALJ must determine whether the evidence supports a legal conclusion that the miner's total disability was "due to" pneumoconiosis. In tort liability cases, physicians/surgeons including their specialties therein necessarily provide medical testimony relating to the legal issue of whether a particular medical condition or injury caused a disability and the percentage thereof. Fact-finders are routinely called upon to resolve legal questions based upon physicians' medical determinations. Moreover, the black lung benefits program is in the nature of workers' compensation, and as *Hawkins* noted, "the black lung legislation was enacted in large part because the state workers' compensation programs were inadequate to meet the needs of disabled miners." 907 F.2d at 701. Under workers' compensation statutes, physicians frequently determine percentage causes of disability. For example, in *Kohler Co. v. Department of Industry, Labor and Human Relations*, 81 Wis.2d 11, 259 N.W.2d 695 (1977), the Wisconsin Supreme Court reviewed a case in which an administrative examiner had adopted a physician's opinion "of one hundred percent disability—fifty percent disability from silicosis and fifty percent disability from the cor pulmonale (pulmonary heart disease)." 81 Wis.2d at 17, 259 N.W.2d 695. The ability of physicians to provide percentage causation determinations in workers' compensation matters is equally applicable to black lung cases. This is especially evident in view of the fact that the silicosis diagnosed in *Kohler* falls within the definition of

pneumoconiosis in 20 C.F.R. § 718.201. The "percentage" standard does not place "the ALJ in the shoes of the doctor" [9] any more than it does a trial judge or one-time lay juror when determining the percentage of disability in a negligence case or an ALJ in a workers' compensation case.

The majority further contends that the "51 percent" standard "places doctors in the impossible position of accounting for the exact degree of impairment caused by pneumoconiosis." Majority at 483. Since doctors have been measuring the percentage of lung impairments and diagnosing asthma, tuberculosis, emphysema, chronic bronchitis as well as pneumoconiosis and other lung diseases for years,[10] I fail to see how requiring a measurement of the percentage of lung damage from pneumoconiosis is any greater burden. There is no doubt that the adoption of the percentage requirement would be far more accurate. But, whether the controlling causation test is "contributing cause," "necessary cause," "substantial contributing cause," or "at least 51 percent of the cause," the physician is required to make a medical finding that pneumoconiosis was a cause of the miner's total disability. This is a routine part of medical practice. Pathologists frequently render judgments concerning whether specific medical problems are the cause of a person's death, including the type of injury and/or the percentage of damage or injury to a particular organ. An orthopedic surgeon routinely evaluates the extent to which certain physical and/or medical conditions limit the range of motion of a limb or extremity. Neurosurgeons provide opinions concerning whether particular seizures are grand mal or of a petit mal severity. Although the "percentage" standard requires a more quantified and extensive demonstration of pneumoconiosis' role in causing the miner's total disability, I am of the opinion that in the

1990's medical technology and research is well able to provide us with sufficient diagnostic tools, including x-rays, spirometry (tests lung capacity), ventilatory studies and blood gas studies, to assist the physician's exercise of medical judgment in reaching a determination of whether the black lung disease constitutes at least 51 percent of the cause of a miner's total disability. That there may be close cases involving a judgment call as to whether black lung disease was over 50 percent responsible for the miner's total disability fails to weigh against the "percentage" test. There are and will always be close cases under any of the possible causation standards. In any close case a physician trained in pulmonary problems certainly is qualified to make a decision dealing with the percentage of a miner's total disability "due to" pneumoconiosis on the basis of medically approved testing and diagnostic procedures. The at least "51 percent causation" standard does not place a physician in any more of an "impossible position" than a doctor in a tort suit determining the percentage of limitation of motion due to a back injury caused by an accident as opposed to a pre-existing condition.

The majority further asserts that the "percentage" test would require that "[t]he validity of the physician's determination . . . be subjected to the scrutiny of the ALJ and the Benefits Review Board—all of whom would be placed in the awkward position of second-guessing the doctor's estimate," and that "[t]he ALJ and the Benefits Review Board are ill-positioned to adjudge the relative presence of Black Lung disease in the body of a miner, for this entails a medical conclusion outside their expertise." Majority at 483. The majority's argument that the evaluation of an ALJ or the Benefits Review Board of the percentage of medical causation "entails a

---

9.  Majority at 483.

10.  As an example of such percentage measurements, doctors routinely use spirometers to measure a person's inhalation and expiration rate to determine the percentage of lung capacity. People with lung damage usually experience more difficulty exhaling than inhaling, and a

spirometer measures the maximum expiratory flow of air from the lungs at one-half-second, one-second, and three-second intervals to determine the degree of lung obstruction. Blood gas studies likewise determine the percentage of efficiency of the exchange of carbon dioxide and oxygen between a person's lungs and blood.

medical conclusion outside their expertise" is at best surprising and at the same time alarming. For ALJs and the Benefits Review Board are doing the same thing today when weighing medical testimony and data and applying it to the all-inclusive, ambiguous standards such as "necessary (but not sufficient) cause," "contributing cause," or "substantial contributing cause." Furthermore, in the forty-four out of the fifty-one states that have adopted comparative negligence legislation, one-time lay jurors and/or judges are called upon daily to apportion the amount of recovery to which a claimant is entitled based upon the percentage of a party's negligence as well as the percentage of the claimant's injury caused by the negligent act. Thus, it is clear that the "51 percent" standard is not the cause of the supposed difficulties. Under any approach to the causation question, the ALJ and the Benefits Review Board must review and evaluate physicians' opinions. Frequently Black Lung cases will involve conflicting medical reports of several physicians who disagree on the question of whether a miner's total disability is "due to" pneumoconiosis. The ALJ need not "second-guess" physicians but must weigh and analyze the evidence and give the reasoning for his or her ultimate decision. The ALJ and a Benefits Review Board are always in the position of weighing medical evidence as is a judge or jury in resolving any medical question in deciding the issues in a medically-related proceeding. "The ALJ must consider all relevant medical evidence, cannot substitute his expertise for that of a qualified physician, and cannot simply disregard the medical conclusions of a qualified physician," without giving his reason. *Peabody Coal Co. v. Helms*, 859 F.2d 486, 489 (7th Cir.1988). But, "[t]he ALJ decides in the first instance whether a medical opinion is sufficiently reasoned and documented." *Amax Coal Co. v. Director, OWCP*, 801 F.2d 958, 962 (7th Cir.1986). Through the use of modern testing and diagnostic procedures, including x-rays and the results of the myriad of pulmonary studies, the ALJ is aided in his assessment of physicians' differing medical judgments. The use of the "percentage" standard no more "promotes distrust in a doctor's ability to exercise sound medical judgment," Majority at 483, than would the ALJ's use of the majority's inconclusive and ambiguous causation standard.

The majority's appeal to the allegedly applicable regulation is similarly ill-founded. The majority raises a "red herring" in citing to Section 718.204(c)(4) of the regulations in support of its arguments against the "51 percent" standard. That section concerns a method to "establish a miner's total disability." Section 718.204(c). But this question is not at issue here because, as the majority notes, the "ALJ found Compton to be totally disabled," Majority at 479, and this issue is uncontested on appeal. Thus, Section 718.204(c)(4), has no relevance to the question of whether the "percentage" standard is an appropriate method to determine whether the miner's total disability was due to pneumoconiosis.

The standard of at least 51 percent causation implements the congressional intent underlying the black lung legislation and provides a definitive, unambiguous and accepted procedure for determining the cause of total disability, relying on competent medical evidence and testimony to insure that only deserving miners suffering total disability at least 51 percent "due to" pneumoconiosis receive black lung benefits. In contrast to the undefined "contributing cause" standard the majority adopts, the "percentage" approach provides the necessary guidelines for an ALJ to properly determine whether the miner's total disability was "due to" pneumoconiosis.

Thus, the ALJ's consideration of the causation issue upon remand should be governed by the "51 percent" test presented above rather than the "contributing cause" standard.